WAGNER CHOI & VERBRUGGE
Attorneys at Law

JAMES A. WAGNER
CHUCK C. CHOI
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: jwagner@hibklaw.com
cchoi@hibklaw.com
aito@hibklaw.com

Proposed Attorneys for Debtor
and Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>POMARE, LTD., dba<br>HILO HATTIE<br><br>        Debtor and<br>        Debtor-in-Possession. | BK. NO. 15-00203<br>(Chapter 11)<br><br>Date: [to be set]<br>Time:<br>Judge: Hon. Robert J. Faris |

73934

**DECLARATION OF MARK J. STORFER IN SUPPORT
OF "FIRST DAY" MOTIONS AND APPLICATIONS**

**MARK J. STORFER** declares, under penalty of perjury, that:

1

1.      I am the Executive Vice President and Chief Operating Officer of Pomare, Ltd. d/b/a Hilo Hattie, the debtor and debtor-in-possession ("Pomare" or the "Debtor") in this bankruptcy Proceeding.

2.      I make this declaration in support of the various "first day" motions and applications filed by the Debtor herein.

3.      Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge and my review of relevant documents. I am competent to testify to the matters herein set forth and, if called upon to do so, I could and would testify to the facts set forth herein.

I.   **DECLARANT'S BACKGROUND AND QUALIFICATIONS**

4.      In my current position, I oversee the overall operations of the Debtor and a current workforce of approximately 109 employees.

5.      I joined the Debtor in May, 2008. I was the Secretary and Treasurer of the Debtor during "Pomare I" (as defined herein) and assisted in the successful confirmation of the "Prior Plan" (as defined herein).

6.      Prior to joining the Debtor, I had my own business consulting firm, the CKC Group. Prior to that, I held senior management positions for several high profile apparel and retail businesses including, without limitation, Liberty House Inc., Guess Jeans, Inc., and Bugle Boy Industries.

## II. DEBTOR'S BACKGROUND

7. Pomare was incorporated in Hawaii on December 27, 1967, by James Romig for the purpose of manufacturing, wholesaling, and retailing of garments, home furnishings, and souvenirs. Mr. Romig was the controlling stockholder and chief executive of the Debtor from its founding through July 10, 2008. During this period, Pomare established itself as one of the best known brands for tourist wear, accessories, and gift items in the State of Hawaii and nationally. Hilo Hattie is a renowned brand in the visitor industry and the Debtor is still one of the state's largest purveyors of tourist-oriented products.

8. On July 11, 2008, TOC, Inc., a Nevada corporation ("TOC"), acquired all of the outstanding the Debtor from Romig.

### A. DEBTOR'S PRIOR BANKRUPTCY FILING

9. On December 2, 2008, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "2008 Bankruptcy Case") in the U.S. Bankruptcy Court for the District of Hawaii (the "Court"). *See In re Pomare, Ltd.*, Case No. 08-01448 ("Pomare I").

10. Several events precipitated the filing of Pomare I, including the following:

    (a) In the mid-2000's, the Debtor launched an aggressive expansion initiative which included opening new stores on the U.S.

mainland, in Guam and here in Hawaii and which resulted in the Debtor becoming financially and operationally over-extended. For the most part, the new stores were not profitable and eventually were closed at a significant cost, leaving the Debtor with too much overhead, all of which resulted in declining sales and profits (which quickly became losses). In an effort to "right the ship," the Debtor ceased manufacturing in approximately 2005-2006 and began purchasing more and more products (notably apparel) offshore in hopes of achieving higher margins. This strategy led to a loss of the Debtor's reputation for high-quality, Hawaiian-made products and led to a decline in average purchase per customer.

(b)  The "Great Recession" of 2008 weakened Hawaii's tourist-driven economy, and led to a credit crunch which greatly impeded the Debtor's attempt to restructure operations without a Chapter 11 filing.

11.  The 2008 Bankruptcy Case was contentious, primarily due to the Debtor's highly leveraged condition. The Debtor's balance sheet at the time (September, 2008) showed approximately $13 million in liabilities, including approximately $2.4 million on various capital leases with Central Pacific Bank, Bank of Hawaii, and First Hawaiian Bank ("FHB").

12.  The Unsecured Creditors' Committee appointed in Pomare I, chaired by the former President of the Debtor, unsuccessfully sought the appointment of a

4

Chapter 11 Trustee. In addition, the Office of the U.S. Trustee moved to convert or dismiss the Chapter 11 case due to its administrative insolvency.

13. In June, 2009, TOC transferred all of the Debtor's equity (including TOC's position as DIP lender) to Donald B.S. Kang, the owner of Royal Hawaiian Creations ("RHC"). Mr. Kang resigned from the Unsecured Creditors' Committee and funded the Debtor's critical capital needs through a DIP loan.

14. Pursuant to an order and findings entered on October 2, 2009, the Court confirmed the Debtor's Chapter 11 Plan dated July 31, 2009 (the "Prior Plan"). *See* docket ## 603 and 604 in Case No. 08-01448. The Effective Date of the Prior Plan occurred on October 5, 2009. *See Notice of Effective Date of Plan*, docket # 610, in Case No. 08-01448.

15. Among other things, the Prior Plan provided that: (1) general unsecured creditors could be paid 5% of their allowed claims in equal annual installments of 1%, beginning on October 5, 2010; and (2) Donald B.S. Kang would receive New Common Stock of the Reorganized Debtor in complete satisfaction, discharge, exchange and release of Mr. Kang's Allowed Secured Claim (the DIP loan).

16. On February 22, 2011, the Court entered an order closing the 2008 Bankruptcy Case. *See* docket #793, in Case No. 08-01448.

17. The Debtor paid out approximately 78% of the approximately $1,337,400.00 in payments to general unsecured creditors contemplated under the Plan.

B. EVENTS LEADING TO THE PRESENT CHAPTER 11 FILINGS

18. Through the 2008 Bankruptcy Case, the Debtor restructured its operations and financial obligations, through new ownership and management. It emerged with seven retail outlets in Hawaii, (the Nimitz Property store, the Ala Moana Store, the Kihei Store, the Lihue Store, the Lahaina Store, the Kona Store and the Hilo Store) with approximately 200 employees.

19. However, most of the Debtor's outer island stores continued to underperform relative to projections. The Debtor's gross sales for fiscal year-end September 27, 2014, were approximately $15.564 million, compared to $23.596 million for the prior year. The Debtor's operating loss for fiscal 2014 increased to $5.084 million, up from a loss of $2.374 million in fiscal 2013.

20. Consequently, in the past 30 days, the Debtor closed three of its seven retail outlets located in Kihei, Maui, Kona, Hawaii and Hilo, Hawaii. The Kihei and Kona stores, which were leased from entities controlled by Jim Romig and the Hilo store was leased from Prince Kuhio Plaza, LLC. In connection with these closures, the Debtor stipulated to judgments in the amounts of $120,400.49 in favor of Kona Coast Investment and $336,406.63 in favor of RPC Piilani, LLC, for

U.S. Bankruptcy Court - Hawaii   #15-00203   Dkt # 16   Filed 02/19/15   Page 6 of 16

the Kona and Kihei stores. In addition, the landlords for the Kihei, Kona and Hilo stores have obtained stipulated writs and judgments for possession.

21. Also, in connection with these store closures, the Debtor laid off approximately 60 employees and currently has approximately 109 employees. The store closures will significantly improve the Debtor's cash flow in coming months. I project that the Debtor will be able to remain current on its post-petition obligations.

22. In the past 60 days, a number of collection and eviction actions have been commenced against the Debtor against which the Debtor does not have a viable defense. Without the protection afforded by Chapter 11, the Debtor would soon be subject to execution actions.

23. Currently, the Debtor has approximately 109 full and part-time employees and operates four retail outlets located in Hawaii at the following locations:

- Nimitz Flagship Store, 700 N. Nimitz Highway, Honolulu HI 96817
- Ala Moana, 1450 Ala Moana Blvd., #1254, Honolulu HI 96814
- Kauai, 3-3252 Kuhio Highway, Lihue HI 96766
- Lahaina, Lahaina Center, 900 Front St., Building D, Lahaina HI 96761

24. The Debtor's major assets consist of approximately $2.2 million of inventory and the value of its Nimitz leasehold which is believed to be in excess of $4 million (although the lease has been fully depreciated on the Debtor's books). The Debtor is marketing the Nimitz lease for sale.

25. In addition to the FHB secured indebtedness. The State of Hawaii has recorded a lien for approximately $130,000 in taxes. The Debtor has approximately $9 million of accounts payable (including more than $4 million owed to Royal Hawaiian Creations), approximately $2.76 million of unsecured notes payable to Donald Kang, and obligations to its landlords estimated to be approximately $2.6 million.

## III. FIRST DAY MOTIONS

26. The Debtor is filing concurrently herewith various "first day" motions and applications. The relief requested in the motions and applications will enable the Debtor to continue to operate effectively. Accordingly, the Debtor requests that all of the "first day" motions and applications be granted in their entirety.

### A. CASH COLLATERAL MOTION

27. I have reviewed the Motion for Order Authorizing Debtor to Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2) (the "Cash Collateral Motion").

28. All of the facts set forth in the Cash Collateral Motion are true and correct to the best of my knowledge, information and belief.

29. Attached to the Cash Collateral Motion as <u>Exhibit A</u> is a true and correct copy of a Financing Statement and Lien Report (the "UCC Report") for the Debtor dated as of January 8, 2015. The only UCC creditors identified in the UCC Report are: (a) FHB; (b) Cisco/CSC for a computer systems equipment lease; and (c) the United States Postal Service for postage.

30. The Debtor has one creditor which holds a blanket lien on the Debtor's inventory, receivables and other personal property assets, FHB. The bank is owed approximately $850,000.00 pursuant to two short term loans as described in the Cash Collateral Motion. FHB also holds (as additional collateral) accommodation mortgages on real property owned by Mr. and Mrs. Kang. However, the Debtor's most valuable asset, its leasehold interest in the Nimitz Store, is unencumbered except for a State of Hawaii tax lien in the amount of approximately $130,000.

31. As of the morning of the Petition Date, the Debtor was holding approximately $1,000.00 in cash in its various accounts and held approximately $2.2 million in inventory at cost.

32. Attached to the Cash Collateral Motion as <u>Exhibit B</u> is a true and correct copy of the cash flow budget for the period for the three months ending June 30, 2015, prepared to project the expected cash flow from the Debtor's operations for the period which the Debtor requests the use of the Cash Collateral.

33. Based on the historical data, and after examining the Debtor's business, making reasonable and conservative assumptions regarding projected operations, and considering the impact of the bankruptcy process on the operations of the Debtor, the Debtor projects that the aggregate levels of cash will increase during the course of this proceeding.

B. MOTION TO PAY PRE-PETITION WAGES

34. I have reviewed the Motion for Order Authorizing Debtor to Pay Pre-Petition Wages and Other Employment-Related Costs and Expenses and to Honor Pre-Petition Employee Benefits ("Wage Motion"). The facts regarding the operation of the Debtor, particularly those facts pertaining to the wages and benefits paid to the Debtor's employees as set forth in the Wage Motion, are true and correct to the best of my knowledge, information, and belief.

35. Payment of the employee wages and benefits as requested will prevent disruption to the Debtor's operations and preserve the goodwill of the Debtor for the benefit of all of the Debtor's creditors.

36. Attached to the Wage Motion as <u>Exhibit A</u> is a true and correct copy of a list showing the net pay received by the Debtor's employees for the period ending February 14, 2015.

37. Attached to the Wage Motion as <u>Exhibit B</u> is a true and correct copy of a list showing the total accrued vacation and sick pay for the Debtor's employees.

### C. MOTION TO HONOR EXISTING MERCHANT SERVICES AGREEMENT AND AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM AND CERTAIN BANK ACCOUNTS

38. I have reviewed the Motion for Order Authorizing the Debtor to Honor the Existing Merchant Service Agreement, and Authorizing the Continued Use of the Existing Cash Management System and Certain Bank Accounts ("Merchant Services Motion"). All of the facts set forth in the Merchant Services Motion are true and correct to the best of my knowledge, information and belief.

39. Attached to the Merchant Services Motion as <u>Exhibit A</u> is a true and correct copy of Electronic Draft Capture Program agreement.

40. If the Debtor were to have to set up new accounts, the Debtor would have to devote a large number of hours to accomplish that result, for no monetary benefit, and the result would be unnecessary administrative problems with automatic deposits and payments.

41. I fully expect that if anyone ever had a question about the post-petition use of the existing bank accounts, either I or other people in the employment of the Debtor could easily identify whether payments or deposits were made before or after the Petition Date.

11

U.S. Bankruptcy Court - Hawaii    #15-00203    Dkt # 16    Filed 02/19/15    Page 11 of 16

42. With modern software tools and the bank accounts being online, the Debtor can easily account for every single debit or credit item for each account. The Debtor can access its account activity and download the information onto spreadsheets. These tools enable the Debtor to easily create a daily report itemizing each debit and credit entry, and the Debtor can add data to the spreadsheet identifying each of the account transactions, if that degree of information would ever be required.

### D. APPLICATION FOR ORDER APPROVING EMPLOYMENT OF WAGNER CHOI & VERBRUGGE AS COUNSEL TO THE DEBTOR

43. In the Application for Order Approving Employment of Wagner Choi & Verbrugge as Counsel to Debtor ("WCV Employment Application"), the Debtor moves the Court for an interim and final order authorizing the Debtor to retain the law firm of Wagner Choi & Verbrugge ("WCV") as its general counsel for its Chapter 11 bankruptcy proceedings.

44. The Debtor requires a law firm to represent it during the bankruptcy proceeding. The Debtor wishes to retain WCV as its bankruptcy counsel.

45. WCV has considerable experience in representing debtors under chapter 11 of the Bankruptcy Code. WCV previously represented the Debtor in the 2008 Bankruptcy Case. The Debtor believes that it is in the best interest of the

12

U.S. Bankruptcy Court - Hawaii   #15-00203   Dkt # 16   Filed 02/19/15   Page 12 of 16

Debtor's estate that WCV be employed to represent the Debtor effective as of the Petition Date.

46. I believe that granting the WCV Employment Application is in the best interest of the Debtor and should be granted.

E. INTERIM FEE PROCEDURE MOTION

47. I have reviewed the Motion For Order Establishing Interim Fee Application and Expense Reimbursement Procedures (the "Interim Fee Motion"). All of the facts set forth in the Interim Fee Motion are true and correct to the best of my knowledge, information and belief.

48. The proposed procedure, if approved, would permit the Debtor's professionals to be compensated and reimbursed for expenses incurred on an interim basis and in a reasonably contemporaneous manner, subject, however, to oversight and review by the Debtor, certain creditors, the Office of the U.S. Trustee, and the Court.

49. I believe that the Motion to Establish Interim Compensation Procedure is in the best interests of the Debtor and that it should be granted.

F. MOTION FOR ORDER ESTABLISHING NOTICE PROCEDURES

50. I have reviewed the MOTION FOR ORDER ESTABLISHING NOTICE PROCEDURES ("Notice Procedure Motion"). All of the facts set forth

in the Notice Procedure Motion are true and correct to the best of my knowledge, information and belief.

      G.      MOTION TO HONOR PREPETITION CUSTOMER GIFT CERTIFICATES

51. I have reviewed the Motion for Order Authorizing Debtor to Honor Pre-Petition Customer Merchandise Credit and Gift Certificates ("Gift Certificate Motion"). All of the facts set forth in the Gift Certificate Motion are true and correct to the best of my knowledge, information and belief.

52. I further believe that the relief sought, as set forth in the in the Gift Certificate Motion, is critical to the Debtor preserving the goodwill of the Debtor.

      H.      UTILITIES MOTION

53. I have reviewed the Motion for Order Pursuant to 11 U.S.C. § 366 Prohibiting Utilities from Altering, Refusing or Discontinuing Services and Determining that Adequate Assurance of Payment for Future Utility Services has been Provided to Utilities ("Utilities Motion"). All of the facts set forth in the Utilities Motion are true and correct to the best of my knowledge, information and belief.

54. I fully expect that the Debtor will be able to continue to pay on a current basis the cost of operating its business, including the payment of Utilities (as defined in the Utilities Motion) in full on a monthly basis in the ordinary course of its operations.

14

55. Attached to the Utilities Motion as <u>Exhibit A</u> is the most recent itemized list of all Utilities which presently provide service to the Debtor. The list also shows that for a typical month, the combined total of all payments to be made to the Debtor's Utilities is approximately $50,000.

I. PREMIUM FINANCING MOTION

56. I have reviewed the Motion for Order Authorizing Debtor to Continue Financing Insurance Premiums (the "Insurance Financing Motion").

57. All of the facts set forth in the Insurance Financing Motion are true and correct to the best of my knowledge, information and belief.

58. Attached to the Insurance Financing Motion as <u>Exhibit A</u> are true and correct copies of the two separate pre-petition Commercial Premium Finance Agreements between the Debtor and AFCO.

IV. **CONCLUSION**

59. In order to minimize any loss of value and disruption to the Debtor's business, the Debtor intends to engage in business as usual following the commencement of their Chapter 11 cases, with as little interruption to its operations as possible. I believe that if this Court grants the relief requested in each of the first day motions and applications the Debtor has filed, the prospect for achieving this objective, to the maximum benefit of creditors and the Debtor's estates, will be greatly enhanced.

60. I declare under penalty of perjury that the foregoing is true and correct.

Dated: Honolulu, Hawaii, February 19, 2015.

/s/ Mark J. Storfer
MARK J. STORFER