WAGNER CHOI & VERBRUGGE
Attorneys at Law

JAMES A. WAGNER
CHUCK C. CHOI
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: jwagner@hibklaw.com;
cchoi@hibklaw.com;
aito@hibklaw.com

Attorneys for Debtor
and Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | BK. NO. 15-00203 |
| | (Chapter 11) |
| POMARE, LTD., dba | |
| HILO HATTIE | |
| | |
| Debtor and | HEARING |
| Debtor-in-Possession. | DATE: May 18, 2015 |
| | TIME: 2:00 p.m. |
| | JUDGE: Hon. Robert J. Faris |

74311v6

**DEBTOR'S MOTION REQUESTING ENTRY OF AN ORDER (1) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE NIMITZ LEASE; (2) APPROVING CERTAIN BIDDING PROCEDURES RELATING TO THE SALE OF THE NIMITZ LEASE AND FORM OF CONFIDENTIALITY AGREEMENT; (3) APPROVING BUYER AS STALKING HORSE BIDDER AND APPROVING PAYMENT OF BREAK-UP FEE; AND (4) SCHEDULING AUCTION AND HEARING ON PROPOSED SALE; EXHIBITS A - F**

Pomare, Ltd., dba Hilo Hattie, the above-captioned debtor and debtor in possession ("Debtor"), through its undersigned counsel, respectfully submits this motion ("Motion") requesting entry of an order:

1.     Approving the Debtor's sale/assumption and assignment of that certain Lease, by and between James Stewart Romig, as Lessee, and Honolulu, Limited, as Lessor, dated August 24, 1982, which Lease was assigned to the Debtor by that certain Assignment of Lease, dated July 11, 2004, covering the Debtor's property located at 700 North Nimitz Highway, Honolulu, Hawaii 96817, as amended, to Adobe/Avery Parkway, LLC ("Buyer"), free and clear of all liens and encumbrances not noted on the Preliminary Report, revised as of March 26, 2015, a copy of which is attached hereto as Exhibit A, or such other Successful Bidder, determined pursuant to the Bidding Procedures, set forth herein ("Sale/Assignment").  A copy of the Lease, together with copies of all amendments through the Sixth Amendment to Lease and the Assignment of Lease to Pomare, is attached hereto as Exhibit B.  The Lease will be further amended upon Closing of the Sale/Assignment to the extend the Lease an additional twenty (20) years, pursuant to the terms of a Seventh Amendment to Lease described below.  The Lease amendments and assignments attached hereto as Exhibit B, together with the Seventh Amendment to Lease are hereinafter referred to collectively as the "Nimitz Lease" or the "Property."

2.      Approving Buyer as the "stalking horse" bidder on the terms and conditions set forth in that certain Letter of Intent, dated March 25, 2015 ("LOI"), pursuant to which Buyer has offered to acquire the Property for $4,800,000. A copy of the LOI is attached hereto as Exhibit C. The LOI provides that the parties will execute a formal Purchase Agreement. A copy of the Purchase Agreement will be filed with the Court upon its execution and it will supersede the LOI. The Debtor and the Buyer have agreed to amend the timeline set forth in the LOI to be consistent with the revised timeline set forth in this Motion.

3.      Approving payment of a break-up fee ("Break-Up Fee") in the amount of $250,000, to Buyer on the conditions set forth in the LOI and Bidding Procedures.

4.      Approving certain bidding procedures ("Bidding Procedures") relating to the sale of the Property. The Bidding Procedures are summarized below, and a form of Bidding Procedures to be provided to any prospective bidder is attached hereto as Exhibit D.

5.      Approving a form of a confidentiality agreement ("CA"), substantially in the form attached hereto as Exhibit E.

6.      Scheduling certain deadlines and hearings, including the date of the auction described in the Bidding Procedures and the hearing on a confirmation of a sale.

# I.

## JURISDICTION

1.      This Court has jurisdiction over the subject matter of this

Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District

pursuant to 28 U.S.C. §§ 1408 and 1409.  The instant proceeding is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court possesses the requisite

authority to grant the relief requested herein pursuant to sections 105(a), 363(b),

and 365 of the Bankruptcy Code.

# II.

## BACKGROUND

1.      On February 19, 2015 (the "Petition Date"), the Debtor filed a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United

States Bankruptcy Court for the District of Hawaii (the "Court").

2.      The Debtor successfully confirmed a plan of reorganization in

"Pomare I" pursuant to an order entered on October 2, 2009, in case no. 08-01448.

3.      Notwithstanding the first reorganization, most of the Debtor's

outer island locations continued to underperform relative to projections.  More

importantly, for the fiscal year ending September 27, 2014, the Debtor's operating

loss totaled more than $5 million and its sales dropped from approximately $23.6

to $15.6  million for the same fiscal period.

4.    Consequently, in the 30 days prior to the Petition Date, the Debtor closed three of its seven retail stores located in Kihei, Maui, and in Hilo and Kona, Hawaii.  The Debtor currently operates at four locations, its flagship Nimitz Highway location, Ala Moana Shopping Center, Lahaina, and Lihue.

5.    The Debtor's major assets consist of the value of the Property, which is believed to be in excess of $5 million and inventory valued at cost at $2.2 million.

6.    Even though the Property is the most significant asset held by the Debtor, the Property also constitutes a substantial drag on the Debtor's business.  The Property originally held the Debtor's manufacturing facility, but the Debtor no longer manufactures its inventory and the old manufacturing space is no longer needed.  The Debtor has determined that the highest and best use of the Property for the Debtor's future is to sell the Property to the highest bidder.

7.    The following liens and judgments were filed against the Debtor prior to the Petition Date and may constitute liens against the Property:

(a)    That certain Certificate of State Tax Lien, recorded in the Bureau of Conveyance of the State of Hawaii on October 15, 2014, as Document No. A-54010952 in the amount of $129,794.81.

(b)     That certain Judgment in favor of Kona Coast Investment Company recorded in the Bureau of Conveyances of the State of Hawaii on February 12, 2015, as Document No. A-55210782 in the amount of $120,400.49.

(c)     That certain Judgment in favor of RPC Piilani, LLC recorded in the Bureau of Conveyances of the State of Hawaii on February 12, 2015, as Document No. A-55210781 in the amount of $336,406.63.

The Property is Land Court property and none of the above instruments are recorded on the Transfer Certificate of Title for the Property. Additionally, the two Judgments were recorded just before the Petition Date. The recordings are within the preference period and are avoidable.

8.     The Property is also encumbered by unpaid real property taxes in the amount of $434,304, as of April 30, 2015. The real property taxes will be paid in full at Closing of the Sale/Assignment.

9.     First Hawaiian Bank ("FHB") holds a blanket lien on the Debtor's inventory, receivables and other personal property assets. FHB is owed approximately $850,000, however, FHB does not have a mortgage on the Nimitz Lease.

10.     Honolulu Limited, the Lessor, under the Nimitz Lease, owed approximately $2,500,000, in back rent as of the Petition Date, however, the Debtor and the Lessor have entered into a Letter Agreement, dated April 14, 2015,

a copy of which is attached hereto as Exhibit F and incorporated herein by reference. Pursuant to the Letter Agreement, the Lessor has agreed to accept $1,000,000 as a cure payment based on the Purchase Price set forth in the LOI, and in the event there is overbidding, to accept $1,000,000, plus fifty percent (50%) of all excess Net Proceeds in full satisfaction of the pre-petition rent arrears, provided that post-petition rent is paid in full through the closing date of the assignment of the Nimitz Lease to Successful Bidder. Honolulu Limited has also agreed to a 20-year extension to the Nimitz Lease on the same terms and conditions as set forth in the Nimitz Lease, excluding reconstruction requirements set forth in paragraph 15 of the Nimitz Lease. A copy of the agreed-upon Seventh Amendment to Lease is attached as Exhibit A to the Letter Agreement.

## III.

## RELIEF REQUESTED

**Assumption and Assignment of the Nimitz Lease**

1.     The Debtor proposes to enter into the LOI, pursuant to which Buyer will proceed as the "stalking horse" bidder for the Property. Pursuant to the terms of the LOI, Buyer has agreed to pay to the estate $4.8 million in cash ("Purchase Price") for the Property.

2.     The Debtor believes Buyer's offer to be fair and reasonable and the highest the Debtor has received to date after more than 12 months of marketing

the Property pre-petition.  Buyer's offer is not preemptive, instead, Buyer has agreed to permit the Debtor to engage in a marketing effort to solicit potential overbidders.

3.     Buyer faces the risk that, in the next several months, it will spend valuable time and resources conducting due diligence and documenting this transaction only to see its offer outbid.  Thus, Buyer conditioned its proposal on approval of the Bidding Procedures, including the Break-Up Fee.  The Debtor, in the exercise of its business judgment, firmly believes that Buyer is the ideal "stalking horse" candidate because the $4.8 million Purchase Price is the highest and best to date and the risk of Buyer failing to consummate the contemplated transaction is low.

4.     The Debtor believes that Buyer has sufficient financial resources and other business attributes to provide Lessor with adequate assurance of future performance of the Lease.

**Proposed Bidding Procedures**

5.     The Bidding Procedures are designed to maximize value to the estate, in several ways:

(a)     The Bidding Procedures establish a high minimum price that the estate is reasonably assured of receiving, whether or not third parties decide to bid.

(b)     The Bidding Procedures establish a transaction, at a fixed price and under fixed conditions.

(c)     The Bidding Procedures provide for the Debtor to undertake a marketing effort focused upon qualified potential bidders to maximize the likelihood of a competitive auction.

(d)     The Bidding Procedures give third parties the opportunity to overbid, thereby retaining the upside of an auction.

(e)     The Bidding Procedures provide for the means by which all qualified prospective third party over-bidders can conduct comprehensive due diligence in a time frame that will facilitate their ability to formulate and submit a competing bid, if they so choose.

6.      The Debtor believes that the Bidding Procedures are well within the norm of comparable chapter 11 cases.

7.      The Bidding Procedures generally contain the following provisions:

- Procedures to permit entities to become "Potential Bidders", which procedures include providing the Debtor (a) non-binding indications of interest; an executed CA; proof of financial ability and corporate authority; and identification of the bidder and bid sponsors;

- Procedures establishing the means to obtain due diligence and a reasonable time period to formulate bids;

- Procedures for determining Qualified Bidders and Qualified Bids, including requiring the submission of acquisition documents, which shall not be subject to any financing or due diligence requirements;

- Approving Buyer's Break-Up Fee;

- The minimum overbid procedures and cash deposit requirements;

- The notice of and procedures for conducting the Auction;

- The identification and acceptance of the successful bid; and

- Procedures and deadlines relating to definitive documentation of the transaction.

## Description of the CA

8.     Pursuant to the Motion, the Debtor requests that this Court approve the form of the CA in the form attached hereto as Exhibit E, which would govern the flow of confidential information to prospective bidders. The CA contains standard provisions in such circumstances, including the provision restricting any potential bidder from discussing potential bids with any other

potential bidder, including Buyer. The purpose of this restriction is to thwart any activities that have the appearance of collusive bidding.

**Scheduling of the Auction**

      9.    The Debtor, with Buyer's concurrence, proposes the following schedule, subject to the Court's availability:

| PROPOSED DATE (on or before) | EVENT |
|---|---|
| April 30, 2015 | Complete and file executed Purchase Agreement |
| May 18, 2015 | Hearing on order approving Buyer as Stalking Horse Bidder, Bidding Procedures and CA |
| May 25, 2015 | Due diligence period begins |
| July 20, 2015 | Expiration of period to conduct due diligence |
| July 24, 2015 | Deadline to submit Bids |
| July 27, 2015 | Notification of Qualified Bids |
| July 31, 2015 | Auction, if Overbids<br>Notification of Successful Bidder to Lessor and other parties |
| August 10, 2015 | Hearing on assumption and assignment of the Nimitz Lease to the Successful Bidder |

## IV.

## ARGUMENT

**A.    The Debtor Has Articulated a Reasonable Business Justification for Selecting Buyer as the Stalking Horse Bidder.**

1.      By this Motion, the Debtor requests that this Court approve its selection of Buyer as the "stalking horse" bidder and assignee of the Nimitz Lease on the terms and conditions set forth in the LOI.

2.      The selection of Buyer as the "stalking horse" bidder is within the range of reasonableness. Buyer's proposal minimizes any execution risk because there are few meaningful due diligence "outs" such as financial or financing contingencies. While the LOI provides Buyer with an additional due diligence period, Buyer will only be entitled to the Break-Up Fee if Buyer affirms its Bid on or before the Bid deadline date.

3.      As long as the Debtor has exercised its sound business judgment, this Court should approve the Debtor's decision to select Buyer as the "stalking horse" bidder. In *In re Castre, Inc.*, 312 B.R. 426 (Bankr. D. Colo. 2004), a bankruptcy court was faced with approving either a "stalking horse" bid selected by the debtor or a competing bid where both bids were economically similar. The facts of *Castre* indicate that the "stalking horse" bid in that case actually carried more execution risk than the competing bid. *Id.* at 430. Nonetheless, the bankruptcy court approved the "stalking horse" bid:

> [T]he trustee or DIP is entitled to great judicial deference in deciding which bid to accept as the best and highest bid on the sale of the Debtor's assets; and, although the trustee's or DIP's discretion is not without limit, the Court should not step in and assume a role and responsibility properly placed by the Code in another's hands.

> In the final analysis, the Court believes it should approve
> the Debtor's recommendation for the [stalking horse] bid.
> It is in a better position than the Court to choose between
> its two suitors.

*Id.* at 430-31. The *Castre* court further stated that it was approving the "stalking

horse" bid even though the "stalking horse" "had earlier and more contact with the

DIP with concomitantly more exposure to the DIP's assets." *Id.* at 431.

    4.    Applying *Castre* to the facts here, this Court should approve

Buyer as the "stalking horse" bidder.

**B.    The Proposed Bidding Procedures are in the Best Interests
of the Estate and the Debtor's Creditors.**

    5.    The paramount goal in any proposed sale of property of the

estate or any plan of reorganization is to maximize the net proceeds received by the

estate. *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores,

Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a

primary objective of the Code [is] to enhance the value of the estate at hand");

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re

Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1990) ("It is a well-established

principle of bankruptcy law that the objective of bankruptcy rules and the Debtors'

duty with respect to such sales is to obtain the highest price or greatest overall

benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99

B.R. 124, 130 (Bankr. N.D. Ga. 1998)).

6.      To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. *See, e.g., Integrated Res.*, 147 B.R. at 659 (stating such procedures should "encourage bidding and . . . maximize the value of the Debtors' assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) (stating that "court-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and . . . provide for a fair and efficient resolution of bankrupt estates"), *appeal dismissed*, 931 F.2d 217 (2d Cir. 1991).

7.      Bankruptcy courts frequently have approved bidding procedures in advance of a proposed sale or other disposition of property of the estate, whether through an asset sale under Bankruptcy Code section 363(b) or through a plan confirmation process. *See, e.g., Doehring v. Crown Corp. (In re Crown Corp.)*, 679 F.2d 774, 775 (9th Cir. 1982) (district court approved specified minimum overbid amounts, deposits, and the form of purchase agreement to be used by bidders); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 878-879 (Bankr. S.D.N.Y. 1990) (bankruptcy court entered an order requiring that overbids be made in specified minimum increments with deposits).

8.      Courts have made clear that a debtor's business judgment is entitled to great deference with respect to bidding procedures. *See, e.g., Integrated*

*Res.*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor in possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

9.    In analyzing the propriety of bidding procedures, a court will examine whether such procedures allow third parties to submit higher and better bids and whether potential bidders have sufficient time to conduct their own due diligence.  *See, e.g., In re Titusville Country Club*, 128 B.R. 396, 400 (Bankr. W.D. Pa. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). Moreover, the hallmarks of good faith in any auction procedures are the receipt of adequate value through the potential for higher and better offers, and full and accurate disclosure of the terms of the proposed sale to third parties invited to bid. *See Kabro Assocs., LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 277 (2d Cir. 1997) (affirming good faith finding where objector failed to comply with clear bid instructions and was excluded from auction);*Cumberland Farms Dairies, Inc. v. National Farmers Org., Inc. (In re Abbotts Dairies)*, 788 F.2d 143, 147 (3d Cir. 1986) (stating that the term good faith purchaser "encompasses one who purchases in good faith and for value.").

10.    Here, the proposed Bidding Procedures allow and encourage qualified parties to submit overbids, thereby maximizing the value that the estate

will receive for the Property. The overbid process will allow any qualified party that is willing to increase the purchase price for the Property from the purchase price set forth in the LOI to do so, subject to the provisions of the proposed Bidding Procedures.

11. The Bidding Procedures contemplate full and fair access to confidential information, over an approximately seventy-five (75) day period, to permit additional interested bidders to complete any due diligence. The Bidding Procedures also ensure that each potential bidder can obtain adequate information to conduct due diligence and present informed bids.

12. Moreover, the proposed Bidding Procedures will allow the Debtor and its professionals to solicit and evaluate overbids in a controlled, fair and open fashion, which will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.

13. The Bidding Procedures are the product of the considered business judgment of the Debtor and are fair and reasonable under the circumstances. Accordingly, the Court should approve the Bidding Procedures as being in the best interest of the estate.

**C. The Payment of the Break-Up Fee, if Earned, is Appropriate and Should be Approved.**

14.    Courts have recognized that break-up fees are often a key component to significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . . .  In fact, because the . . . corporation ha[s] a duty to encourage bidding, break-up fees can be <u>necessary</u> to discharge [such] duties to maximize values.

*Integrated Res.*, 147 B.R. at 659-60 (emphasis added).  As stated in *In re 995 5th Ave. Assocs.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989), a bankruptcy court should generally uphold a break-up fee which was not tainted by self-dealing and was the product of arms-length negotiations.

15.    Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking."  *995 Fifth Ave.*, 96 B.R. at 28 (quotation marks omitted); *see also Integrated Res.*, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

16.     Here, Buyer has conditioned the LOI on the Court's approval of, among other things, the Break-Up Fee.  Buyer, however, has <u>not</u> demanded that it be awarded both the Break-Up Fee <u>and</u> an expense reimbursement.  Buyer has not demanded other bid protection devices, such as a "topping fee" or a "last look" provision.

17.     The Break-Up Fee is payable if Buyer has not defaulted and any other party acquires the Property.  In that event, Buyer will be entitled to a fee of $250,000 or 5.2% of the Purchase Price.

18.     The proposed Break-Up Fee was the result of arms' length negotiations between representatives of the Debtor and Buyer.

19.     The Debtor believes that the Break-Up Fee is justified to induce Buyer to enter into the LOI and to adequately compensate Buyer for the risks it is taking.  Buyer's offer is <u>not</u> subject to any financing contingencies and is not dependent on any specific amendment to the ground lease.

20.     The Debtor believes that there may be no LOI, nor any other offer from Buyer or another bidder, unless the Court approves a break-up fee.

**D.     The Minimum Overbid and Subsequent Overbid Increments are Fair and Reasonable.**

21.     Pursuant to the Bidding Procedures, to become a Qualified Bidder, a bidder must comply with the specific requirements set forth in the LOI and the Bidding Procedures, including the submission of a competing bid that

provides benefit to the estate and its creditors, as reasonably determined by the Debtor, that is at least equal to such benefit created by (i) the Purchase Price plus (ii) the amount of the Break-Up Fee. Thus, the minimum overbid is equal to $5.1 million or a $300,000 increase over the Purchase Price. Any subsequent bids must be made in $100,000 increments.

22. The initial overbid of $300,000 represents approximately 6.25% of the Purchase Price, which is in line with the Break-up Fees that other courts have approved for similarly sized transactions. S*ee In re Colony Hill Assocs.*, 111 F.3d 269 (2d Cir. 1997) (requiring 8.7% minimum overbid); *Fin. News*, 126 B.R. at 154 (requiring minimum overbid of $10 million, or 9.5% in excess of the original purchase price).

23. Moreover, the minimum overbid requirement ensures that any initial overbid will fully pay the amount of the Break-Up Fee plus $50,000 for the estate's benefit.

**E.  Sale/Assignment of Lease Free and Clear of Liens.**

24. Section 363(a) of the Code generally provides that a Debtor, after notice and a hearing, may sell, other than in the ordinary course, property of the estate. The proposed sale of the Property is not an ordinary course transaction for this Debtor and requires notice and a hearing. This Motion and the hearing scheduled to consider this matter fulfills that requirement.

25. As noted above, three creditors have recorded instruments in the Bureau of Conveyances and may assert that those instruments create liens against the Property. The Debtor disputes any such assertion as noted above. Section 363(f) provides as follows:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

26. The Debtor asserts that it may sell the Property, pursuant to clauses (3), (4), and (5) of 363(f). The sale price exceeds the total amount of the alleged liens. The alleged liens are in bona fide dispute. The alleged liens can be satisfied by the payment of money. In the event the alleged liens have not been resolved by the time of the hearing to approve the sale to the Successful Bidder, the Debtor will include a provision in the order approving such sale that the alleged liens attach to the proceeds until resolved.

27.     Section 365 of the Bankruptcy Code provides generally for the Debtor's assumption and assignment of real property leases. Section 365(b)(1)(A) requires that the Debtor cure any existing default under the lease. This requirement is satisfied by the terms of the Letter Agreement, attached hereto as Exhibit F.

28.     Section 365(f)(1) and (2) provides as follows:

(f)(1)  Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

(2)     The trustee may assign an executory contract or unexpired lease of the debtor only if –

        (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

        (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

29.     The Debtor believes that a Sale/Assignment of the Property to Buyer satisfies the requirement to show adequate assurance of future performance. The Debtor believes that Lessor will consent to the Sale/Assignment to Buyer prior to the hearing to confirm the Sale/Assignment to the Successful Bidder.

30.     Since in this case the sale process includes an auction of the Property, pursuant to the Bid Procedures, it is possible that another party may be

the Successful Bidder. The Bid Procedures and the timeline proposed herein allow time between the auction and the confirmation of sale hearing to vet the Successful Bidder. All bidders will have been preliminarily vetted in the process set forth in the Bid Procedures to become Qualified Bidders.

**F.     This Court Should Establish the Date, Time and Place of the Auction and Approval of the Sale.**

31.     The LOI and Bidding Procedures propose a comprehensive roadmap that, if approved, should permit this Court to consider confirmation of a sale by Buyer. The Debtor requests that the Court approve the timetable set forth above and set a Confirmation of Sale hearing on or about August 10, 2015.

## V.

## CONCLUSION

For all of these reasons, the Debtor respectfully requests that the Court:

A.     Approve Buyer as the stalking horse bidder;

B.     Approve the Bidding Procedures, including the Break-Up Fee, and the Overbid Increments;

C.     Approve the form of the CA;

D.     Approve the due diligence and bidding schedule set forth above; and

E.     Set a hearing on the approval of the assumption and assignment of the Nimitz Lease to the Successful Bidder for August 10, 2015.

Dated: Honolulu, Hawaii, April 20, 2015.

Respectfully submitted,


/s/ James A. Wagner
JAMES A. WAGNER
CHUCK C. CHOI
ALLISON A. ITO
Attorneys for Debtor and
Debtor in Possession