

SO ORDERED

Lloyd King
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 15-00203 |
| | (Chapter 11) |
| POMARE, LTD., | |
| dba Hilo Hattie | |
| | DATE: May 18, 2015 |
| Debtor and | TIME: 10:00 a.m. |
| Debtor-in-possession. | JUDGE: Hon. Lloyd King |
| | |
| 74614 | |

FINDINGS OF FACT AND CONCLUSIONS
OF LAW IN SUPPORT OF ORDER (1) APPROVING THE ASSUMPTION
AND ASSIGNMENT OF THE NIMITZ LEASE; (2) APPROVING CERTAIN
BIDDING PROCEDURES RELATING TO THE SALE OF THE NIMITZ
LEASE AND FORM OF CONFIDENTIALITY AGREEMENT; (3)
APPROVING BUYER AS STALKING HORSE BIDDER AND APPROVING
PAYMENT OF BREAK-UP FEE; AND (4) SCHEDULING AUCTION AND
<u>HEARING ON PROPOSED SALE; EXHIBITS 1-2</u>

The *Debtor's Motion Requesting Entry Of An Order (1) Approving*

*The Assumption And Assignment Of The Nimitz Lease; (2) Approving Certain*

*Bidding Procedures Relating To The Sale Of The Nimitz Lease And Form Of*

*Confidentiality Agreement; (3) Approving Buyer As Stalking Horse Bidder And Approving Payment Of Break-Up Fee; And (4) Scheduling Auction And Hearing On Proposed Sale* ("Motion") filed herein on April 20, 2015 as Docket #140, came on for hearing on May 18, 2015.

James A. Wagner and Allison A. Ito appeared on behalf of Pomare, Ltd. dba Hilo Hattie (the "Debtor"); Ted Pettit appeared on behalf of Donald Kang; Susan Tius and Nathaniel Higa appeared on behalf of the Unsecured Creditors Committee ("Committee"); Cynthia Johiro appeared on behalf of the Hawaii State Tax Department ("Tax Department");   Jerrold Guben appeared on behalf of  RPC Piilani, LLC and Kona Coast Investment Company; Curtis Ching appeared on behalf of the Office of the U. S. Trustee; Jesse Schiel appeared on behalf of Fleet Financing Resources, LLC; and Thomas H. Yee appeared on behalf of First Hawaiian Bank.   No other appearances were made.

This Court, having reviewed and considered (i) the Motion, the Declaration of Richard A. Williams, II filed in support thereof, (ii) the record in the case; (iii) the Objections and Statements filed in response to the Motion; (iv) the representations of counsel made at the hearing, and it appearing that the relief requested in the Motion is in the best interest of the Debtor, its estate, and creditors and other parties in interest; and upon the record of the hearing; and after due deliberation thereon, adequate notice having been given and good cause appearing

therefore, the Court hereby makes the following Findings of Fact and Conclusions of Law:

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these claims and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief sought in the Motion include sections 105, 363, and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq., as amended ("Bankruptcy Code") and Fed.R.Bankr. P. 2002, 6004, 6006, and Local Bankruptcy Rules 6004-1 and 6006-1.

3.     Proper, timely, adequate and sufficient notice of the Motion and the hearing on the Motion has been provided in accordance with 11 U.S.C. § 102(1), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure, and LBR 6004-1.

4.     Interested parties have had a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

5.     On February 19, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Hawaii (the "Court").

6.     The Debtor is the successor-in-interest lessee under that certain Lease, by and between James Stewart Romig, as Lessee, and Honolulu, Limited, as Lessor, dated August 24, 1982, covering the Debtor's property located at 700 North Nimitz Highway, Honolulu, Hawaii 96817, as amended through the Sixth Amendment to Lease and the Assignment of Lease to Pomare dated July 11, 2004, together with the Seventh Amendment to Lease are hereinafter referred to collectively as the "Nimitz Lease" or the "Property."

7.     Attached to the Motion as Exhibit A is a true and correct copy of a Preliminary Title Report for the Property dated March 26, 2015 (the "PTR"). A copy of the Lease, together with copies of all amendments through the Sixth Amendment to Lease and the Assignment of Lease to Pomare, is attached to the Motion as Exhibit B.

8.     Even though the Property is the most significant asset held by the Debtor, the Property also constitutes a substantial drag on the Debtor's business. The Property originally held the Debtor's manufacturing facility, but the Debtor no longer manufactures its inventory and the old manufacturing space is no longer needed. The Debtor has determined that the highest and best use of the Property for the Debtor's future is to sell the Property to the highest bidder.

9.    The following three liens against the Debtor (collectively, the "Alleged Liens") were recorded prior to the Petition Date and may constitute liens against the Property:

- Tax Department's lien recorded in the Bureau of Conveyance of the State of Hawaii (the "Bureau") on October 15, 2014 as Document No. A-54010952 in the amount of $129,794.81

- Judgment in favor of Kona Coast Investment Company lien recorded in the Bureau on February 12, 2015 as Document No. A-55210782 in the amount of $120,400.49

- Judgment in favor of RPC Piilani, LLC recorded in the Bureau on February 12, 2015 as Document No. A-55210781 in the amount of $336,406.63

The Property is Land Court property and none of the above instruments are recorded on the Transfer Certificate of Title for the Property. Additionally, the two Judgments were recorded just before the Petition Date. The recordings of the two Judgments are within the preference period.

10.    The Property is also encumbered by unpaid real property taxes in the amount of $434,304, as of April 30, 2015. The real property taxes will be paid in full at closing of the sale/assumption and assignment of the Nimitz Lease to Buyer (or such other successful bidder determined pursuant to the Bid Procedures,

hereinafter the "Successful Bidder"),.

11. First Hawaiian Bank ("FHB") holds a blanket lien on the Debtor's inventory, receivables and other personal property assets. FHB is owed approximately $850,000, however, FHB does not have a mortgage on the Nimitz Lease.

12. Honolulu Limited, the Lessor, under the Nimitz Lease, was owed approximately $2,500,000, in back rent as of the Petition Date, however, the Debtor and the Lessor have entered into a Letter Agreement, dated April 14, 2015 (the "Letter Agreement"). Pursuant to the Letter Agreement, the Lessor has agreed to accept $1,000,000 as a cure payment based on the Purchase Price set forth in the Letter of Intent, dated March 25, 2015 between the Debtor and Buyer, and in the event there is overbidding, to accept $1,000,000, plus fifty percent (50%) of all excess Net Proceeds[1] in full satisfaction of the pre-petition rent arrears, provided that post-petition rent is paid in full through the closing date of the assignment of the Nimitz Lease to Successful Bidder. Honolulu Limited has also agreed to a 20-year extension to the Nimitz Lease on the same terms and conditions as set forth in the Nimitz Lease, excluding reconstruction requirements set forth in paragraph 15 of the Nimitz Lease. A copy of the agreed-upon Seventh Amendment to Lease is

---

6

[1] "Net Proceeds" shall mean the gross bid amount confirmed by the Court, less (i) Buyer's broker commission, if any (commissions on the current offer by Buyer of $4,800,000.00 would be $192,000), (ii) real property taxes paid at closing (approximately $500,000), (iii) normal escrow closing and conveyance tax amounts paid by the Debtor, and (iv) the break-up fee, if any.

attached as Exhibit A to the Letter Agreement, which Letter Agreement is attached to the Motion as <u>Exhibit C</u>.

Purchase Agreement

13.    For more than 12 months prior to the Petition Date, the Debtor marketed the Property and the Buyer's offer was the highest and best received by Debtor to date.  Under the circumstances, the Debtor has sufficiently marketed the Nimitz Lease in good faith under the circumstances to secure the highest and best offer therefor.

14.    The terms and conditions set forth in the Purchase Agreement, and the transactions contemplated thereby, represent fair and reasonable terms and conditions, including the amount and the form of payment of the purchase price for the Property in the amount of Four Million Eight Hundred Thousand and no/100 dollars ($4,800,000.00) in United States legal tender (the "Purchase Price"), and currently constitute the highest and best offer obtainable for the Property to date and are fair and adequate.  A copy of the Purchase Agreement is attached hereto as <u>Exhibit 1</u>.

15.    The consideration provided by Buyer for the Nimitz Lease pursuant to the Purchase Agreement:  (i) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (ii) constitutes reasonably equivalent value and fair consideration with respect to

the Debtor in light of the financial condition of the estate and the facts and circumstances that surround the sale.

16. The transaction contemplated by the Purchase Agreement is not subject to any financing contingencies.

17. The Purchase Agreement was negotiated, proposed and entered into by Debtor and Buyer without collusion, in good faith, and from arm's-length bargaining positions. There has been no fraud or collusion between Debtor and any other party with regard to this transaction. The Purchase Agreement and the sale process are not attempts by Buyer to take unfair advantage of other bidders, or possible bidders who might also seek to purchase the Nimitz Lease which are part of the sale under the Purchase Agreement.

18. Neither the Debtor nor Buyer has engaged in any conduct that would cause or permit the Agreement or the sale to be avoided under 11 U.S.C. § 363(n).

19. The Debtor has reasonably exercised its business judgment in determining (1) to enter into the Purchase Agreement for the sale of the Nimitz Lease to the Buyer; and (2) to select Buyer as the "stalking horse" bidder. The relief requested in the Motion is in the best interests of the Debtor's estate.

20. The sale price under the Purchase Agreement ($4,800,000.00) exceeds the total amount of the Alleged Liens.

21. The Alleged Liens are in bona fide dispute.

22.     The Alleged Liens can be satisfied by the payment of money.

23.     The Alleged Liens will attach to the sales proceeds from the Sale/Assignment of the Nimitz Lease unless and until resolved.

24.     The transactions contemplated by the Purchase Agreement satisfy 11 U.S.C. § 363(f)(3), (4), and (5).

25.     The objection filed by the Tax Department on May 6, 2015 is hereby overruled.

26.     The terms and conditions of the Letter Agreement and the Seventh Amendment to Lease are fair and reasonable.  A copy of the Letter Agreement is attached to the Motion as Exhibit F, and a copy of the Seventh Amendment to Lease is attached as Exhibit A to the Letter Agreement.

27.     The Debtor has reasonably executed its business judgment in negotiating and entering into the Letter Agreement and the Seventh Amendment.

28.     The Letter Agreement satisfies Section 365(b)(1)(A)'s requirement that the Debtor cure any existing default under the Nimitz Lease for the Debtor's assumption and assignment of the Nimitz Lease.

29.     The proposed Sale/Assignment of the Nimitz Lease to the Buyer provides adequate assurance of future performance to the landlord under the Nimitz Lease.

<u>Bidding Procedures</u>

30.     The Debtor has articulated good and sufficient reasons for this Court

to: (i) approve those certain bid procedures ("Bid Procedures") relating to the sale

of the Property; (ii) set a schedule for due diligence and bidding, and a hearing on

the assumption and assignment of the Nimitz Lease; and (iii) grant certain bid

protections as provided in the Purchase Agreement and in this Order.

31.     A copy of the Bid Procedures is attached hereto as <u>Exhibit 2.</u>

32.     The Bid Procedures allow sufficient time for potential bidders to

perform due diligence and present informed bids.

33.     The Bid Procedures are fair and reasonable, and allow and encourage

qualified parties to submit overbids, thus maximizing the value that the estate will

receive for the Nimitz Lease.

34.     Approval of the Bid Procedures is in the best interest of the Debtor, its

creditors, its estate, and other parties in interest.

35.     The break-up fee ("Break-Up Fee") in the amount of $250,000.00, if

earned, shall be paid in accordance with the Purchase Agreement.  The Break-Up

Fee (1) is of substantial benefit to the Debtor's estate; (2) is fair and reasonable, in

light of the size and nature of the proposed transaction, the lack of other bid

protection devices, the risk the Buyer is taking in pursuing the acquisition of the

Nimitz Lease as a "stalking horse" bidder, and the efforts that have been or will be

expended by the Buyer notwithstanding that the proposed transaction is subject to higher and better offers for the Nimitz Lease, (3) was negotiated in good faith and at arm's length; and (4) is necessary to ensure that the Buyer will continue to pursue its proposed acquisition of the Nimitz Lease.

36. The Limited Objection filed herein by the Official Committee of Unsecured Creditors on May 4, 2015, is hereby overruled.

37. The form of the confidentiality agreement ("CA") is fair and reasonable under the circumstances. A copy of the CA is attached to the Motion as Exhibit E.

38. The CA provides adequate provisions to thwart any activities that have the appearance of collusive bidding.

**END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SUBMITTED BY:

WAGNER CHOI & VERBRUGGE
Attorneys at Law
JAMES A. WAGNER
CHUCK C. CHOI
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: jwagner@hibklaw.com;
cchoi@hibklaw.com; aito@hibklaw.com

Attorneys for Debtor and Debtor-in-Possession

# EXHIBIT 1

# PURCHASE AGREEMENT

THIS AGREEMENT, is made and entered into this _18_ day of May, 2015, and between POMARE, LTD., a Hawaii corporation, whose principal place of business and post office address is 700 N. Nimitz Highway, Honolulu, Hawaii 96817 (the "Seller"), and ADOBE/AVERY PARKWAY, LLC, a California limited liability company, whose principal place of business and post office address is 301 Forest Ave., Laguna Beach, CA 92651, or its nominee (the "Buyer").

## WITNESSETH THAT:

WHEREAS, the Seller desires to sell and the Buyer desires to purchase all of the Seller's right, title and interest in and to certain leasehold property located at 700 N. Nimitz Highway, Honolulu, Hawaii 96817, as more fully described in the Preliminary Report, revised as of March 26, 2015, attached hereto as Exhibit A, upon the terms and conditions hereinafter set forth.

WHEREAS, the Seller is the Debtor-in-Possession in that certain proceeding entitled, *In re Pomare, Ltd.*, dba Hilo Hattie, Case No. 15-00203 ("Bankruptcy Case"), pending in the U.S. Bankruptcy Court for the District of Hawaii ("Bankruptcy Court").

WHEREAS, this Purchase Agreement is subject to the approval of the Bankruptcy Court in the Bankruptcy Case.

WHEREAS, the Purchaser acknowledges that this Purchase Agreement and the Buyer's right to acquire the Property will be subject to the terms of certain Bid Procedures to be approved by the Bankruptcy Court and attached hereto as Exhibit C.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Bankruptcy Court Approval. This Purchase Agreement shall be subject to the terms and conditions of the Bid Procedures and auction as approved by the Bankruptcy Court. Attached hereto as Exhibit C is a draft of the Bid Procedures submitted to the Bankruptcy Court for approval.

2.     Purchase-Sale. On the terms herein set forth, the Buyer agrees to purchase from the Seller and the Seller agrees to sell to the Buyer the Property, together with any and all buildings and other improvements located thereon of the Sellers fixtures, permits (including use permits and development rights and entitlements), located at or used in connection with or related to such property, to the extent requested by the Buyer, assignable contracts related to the operation and maintenance of the property (all such property being collectively called the "Property").



3.    Purchase Price.  The total purchase price for the Property shall be Four Million Eight Hundred Thousand and No/100 Dollars ($4,800,000) in United States legal tender (the "Purchase Price").

4.    Deposit and Payment of the Purchase Price.

4.01    Deposit.

(a)    Initial Deposit.  A deposit of One Hundred Thousand and No/100 Dollars ($100,000) to be paid by the Buyer to an escrow account at Title Guaranty Escrow Services, Inc. (the "Escrow") within three business days of the last to occur of the (i) full execution and delivery of this agreement to Escrow (ii) Bankruptcy Court approval of Bid Procedures and (iii) Bankruptcy Court approval of the form of this Agreement.

(b)    Additional Deposit.  Buyer shall deposit an additional amount with Escrow in accordance with the terms of the Bid Procedures (attached as Exhibit C) in the event Buyer is the Successful Bidder under the Bid Procedures.  The Initial Deposit and the Additional Deposit are hereinafter referred to as the "Deposit."

(c)    Refund of Deposit:  The Deposit shall be refundable only if (i) Buyer is not the Successful Bidder, or (ii) Buyer does not so elect in writing to accept the Property before the expiration of the Due Diligence period, the Agreement shall terminate and the Deposit shall be returned to Buyer, and Buyer shall not be entitled to the Break-Up Fee. or (iii) escrow fails to close for any reason other than Buyer's default.

4.02    Payment at Closing.  The Purchase Price shall be payable in cash or in immediately available funds on the Closing Date (as that term is hereinafter defined).

5.    Closing Date.  The purchase and sale of the Property shall take place at the office of Escrow not later than the date which is 30 days after the entry of a Final Order in the Bankruptcy Case approving the Buyer as the Successful Bidder under the Bid Procedures, provided, however, Buyer shall have the right to extend the Closing Date for an additional sixty (60) days at Buyer's election by providing written notice to Seller at least three days before the court scheduled closing date confirmed by the Bankruptcy Court ("Closing Date").

6.    Break-Up Fees.  In the event the Buyer confirms its offer/bid for the Property on or before the date set for submission of Bids under the Bid Procedures and the Buyer is not the Successful Bidder approved by the Court, then in such event the Buyer shall be paid a Break-Up Fee in the amount of $250,000, in accordance with the terms of the Bid Procedures.

7.    Submissions and Approval of Documents and Property; Due Diligence.

7.01    Submissions.  The Seller shall, at the Seller's cost, provide the Buyer, within five (5) business days from the date the Buyer executes this Agreement (the "Submission Date"), all of the documents and information designated to be produced on Exhibit "B," attached hereto (collectively, the "Submissions").



7.02    Due Diligence Period.  The Buyer shall have from the date of execution of the Agreement until the date set in the Bid Procedures (the "Due Diligence Period"), to approve or disapprove the Submissions and to review and inspect the physical condition of the Property, including without limitation, the building structure, soils, topography and pest infestation.

Buyer shall investigate, inspect and study the Property to determine if all aspects of the Property are acceptable to Buyer, in Buyer's sole and absolute discretion, including but not limited to, all improvements thereon and including, without limitation, status of title, survey results, zoning classification of the Property, availability and adequacy of all utilities, availability and receipt of all approvals and permits from the local municipality and all necessary county, state and federal agencies as required for Buyer's intended use of the Property, rezoning of the Property and receipt of special land use approval, if needed, for the Buyer's intended use of the Property, the economic suitability and feasibility of the Property for the Buyer's intended use, availability of financing acceptable to Buyer, availability of sufficient parking to serve Buyer's intended use, review and acceptance of environmental and geo-technical inspections, review and acceptance of the physical condition of the Property, including subsurface conditions, availability of adequate access to the Property by public or private roadway or acceptable easements, review of all leases, service contracts, and statements of income and expenses pertaining to the Property and review and approval of such other matters as Buyer shall deem necessary for its intended use of the Property.

At all reasonable times, the Seller will permit the Buyer or its agents or representatives to enter upon and inspect the Property.  The Buyer agrees to conduct such inspections in a manner which will not unreasonably interfere with the quiet use and enjoyment of occupants or tenants of the Property.

Buyer may elect, in writing delivered to Escrow at any time during the due diligence period, to accept the Property.  In the event Buyer does not so elect in writing to accept the Property before the expiration of the Due Diligence period, the Agreement shall terminate and the Deposit shall be returned to Buyer, and Buyer shall not be entitled to the Break-Up Fee.

8.    Conditions Precedent to Closing.

8.01    Seller's Obligations and Conditions in Buyer's Favor.  The Buyer shall have no obligation to consummate the purchase of the Property unless the following conditions have been satisfied by Seller or waived, in writing, by Buyer:

(a)    All terms, covenants and conditions of this Agreement to be complied with and performed by the Seller on or before the Closing Date shall have been duly complied with and performed.

(b)    The representations and warranties made by the Seller herein shall be correct statements of fact as of the Closing Date, with the same force and effect as though such representation and warranties had been made as of the Closing Date.



(c) At least five (5) days prior to the Closing Date, the Seller shall have delivered to the Buyer a commitment by the Title Company to issue to the Buyer, as the insured, an ALTA owner's extended coverage title policy and a chattel lien search covering the Property in the amount of the Purchase Price showing that the Property is free and clear of all encumbrances, except the encumbrances previously accepted by the Buyer in writing, along with a Pro Forma Owner's Title Policy (the "Pro Forma"). The Pro Forma shall contain such endorsements as the Buyer may require, in its sole discretion, to Buyer's satisfaction, including, without limitation, (i) extended coverage endorsement for protection against liens for labor and materials whether or not of record, parties in possession, unrecorded easements, and taxes and special assessments not shown by public records, (ii) survey endorsement, (iii) protection from damage resulting from the exercise of any sub-surface mineral or water rights, and (iv) such other endorsements as may be required by the Buyer. The Seller shall have provided to the Title Company all information, certificates, indemnities, or documents as may be necessary to enable the Buyer to receive the endorsements described above.

(d) Seller shall have paid its share of or been debited for the prorations set forth in Paragraph 14 and the Closing Costs set forth in Paragraph 16.

(e) Seller shall have delivered to Escrow the Seller's Closing Documents as described in Paragraph 12, below.

(f) Seller shall have obtained Lessor's consent to transfer the present Lease to Buyer and also have Landlord's agreement to a twenty (20) year extension to the present Lease term without any requirement presently set forth in paragraph 15 of the Lease, that Lessee be required to demolish and rebuild any improvements on the Property.

If, on the Closing Date, all of the conditions precedent to the Buyer's obligation to purchase as set forth in this Paragraph 8.01 have not been satisfied, the Buyer, at the Buyer's option, may, without waiving or limiting the Buyer's rights and remedies as hereinafter set forth, or as provided for under applicable law, whether at law or in equity, elect to close the transaction in accordance with this Agreement.

8.02   Buyer's Obligations. The Seller shall have no obligation to consummate the sale of the Property unless the following conditions have been satisfied by Buyer, or waived, in writing, by Seller:

(a) All terms, covenants and conditions of this Agreement to be complied with and performed by the Buyer on or before the Closing Date shall have been duly complied with and performed.

(b) The representation and warranties made by the Buyer herein shall be correct statements of facts as of the Closing Date, with the same force and effect as though such representations and warranties had been made as of the Closing Date.

(c) The balance of the Purchase Price is deposited in Escrow on or before the Closing Date.



(d)　Buyer has deposited sufficient funds to pay or be debited for the Paragraph 16 prorations and the Closing Costs in Paragraph 18.

(e)　Buyer has delivered Buyer's Closing Documents to Escrow.

9.　<u>Representations and Warranties of Seller</u>. The Seller hereby represents and warrants to the Buyer as follows, all of which representations shall survive the closing:

(a)　The Seller has or will pay any and all taxes and assessments (excluding taxes not yet due) which have or could become a lien or charge against the Property.

(b)　No portion of the Property has been condemned or otherwise taken by any public authority, and the Seller has no knowledge that any such condemnation is threatened or contemplated.

(c)　No notice from any governmental body has been served upon the Seller to date claiming, in connection with the Property or operation thereof, any violation of any law, ordinance, code or regulation, and the Seller has no knowledge of any of the foregoing.

(d)　The Seller has no knowledge of any pending special assessments against the Property, except the Waikiki Improvement Assessment, and has no knowledge of any proceeding or investigation or potential administrative inquiries or actions relating to the alteration, amendment or changing of the present zoning or use of the Property.

(e)　To the best of Seller's knowledge, other than those disclosed in the Submittal, there are no contracts or agreements or leases (including equipment leases) covering any portion of the Property and/or its operation and maintenance which will be binding upon the Purchase or constitute a lien against the Property or any of the rents, profits or income therefrom. In addition, Seller represents and warrants that the Estoppel Certificates are true and correct.

(f)　The Seller has marketable and insurable title to the Property and is authorized to sell the Property, and will convey the Property to the Buyer pursuant to conveyance documents containing standard warranties of title, free and clear of all liens and encumbrances other than those approved, in writing, by the Buyer.

(g)　Seller is duly incorporated, validly existing, and in good standing in the State of Hawaii and is authorized to conduct business in the State of Hawaii.

(h)　Seller has or will have upon Bankruptcy Court approval of the Buyer as the Successful Bidder of the Bid Procedures and of all requisite power and authority to execute, deliver and perform its obligations under the Agreement, and all documents delivered in connection with this Agreement.



(i)     The execution, delivery and performance of this Agreement, and all documents delivered in connection with this Agreement, have been duly authorized by Seller's Board of Directors.

(j)     The Submissions are true and correct copies of the documents they purport to be and subject to no other amendments, addenda, modifications or changes.

(k)     Seller has no knowledge of any asbestos, lead, hazardous waste or substances or other environmental conditions, violations, or deposits, by any party at any time, on, under or within the subject property or otherwise affecting the subject property or its ground water.

(l)     The Seller has or will pay any and all rent due or payable up to the closing date and the Lease on the Property will be current at not in default at Closing.

10.     Representations and Warranties of the Buyer.  The Buyer hereby represents, warrants to the Seller that:

(a)     Buyer is validly existing, and in good standing in the State of California.

(b)     Buyer has all requisite power and authority to execute, deliver and perform its obligations under the Agreement.

(c)     The execution, delivery and performance of this Agreement have been duly authorized by Buyer's Board of Directors, Owners or Managers.

11.     Operation of Property Pending Closing.  Between the date hereof and the Closing Date: (a) the Seller shall maintain and operate the Property in compliance with all laws and shall make such normal repairs and replacements as are necessary to maintain the same in reasonably good working order and condition, (b) all acts and transactions of the Seller with respect to the Property shall be consistent with customary practices and in the ordinary course of business, (c) the Seller shall not, without the prior written consent of the Buyer, do or cause to be done anything, either directly or indirectly, which may adversely affect the Property or adversely affect the Seller's or the Buyer's interest in the Property, (d) the Seller shall not execute any leases, or lease modifications or extensions, or make any offers to lease or enter into, modify or extend any contracts which the Buyer will be required to assume or which would impose any obligation on the Buyer, without the Buyer's prior written consent, and (e) the Seller will not institute, continue or prosecute proceedings to alter, amend or change the present zoning classification of the Property.

12.     Seller's Closing Documents.  The Seller shall deliver to Escrow on or before the Closing Date the following items necessary for the closing of the purchase and sale of the Property all in form and content reasonably satisfactory to counsel for the parties:

(a)     Assignment of Lease



        (b)    Bill of Sale, if requested for fixtures

        (c)    Closing statements, as required by Escrow

        (d)    An executed non-foreign person certificate

        (e)    Such other customary documents as may be reasonably required to consummate the transaction contemplated by this Agreement

13. <u>Buyer's Closing Documents</u>. On or before the Closing Date, the Buyer shall deliver to Escrow the following items necessary for the closing of the purchase and sale of the Property, all in form and content reasonably satisfactory to counsel for the parties:

        (a)    The balance of the Purchase Price for the Property

        (b)    An amount to pay Buyer's Closing and Escrow Costs

        (c)    Closing Statements, as required by Escrow

        (d)    Such other customary documents as may be reasonably required to consummate the transaction contemplated by this Agreement.

14. <u>Eminent Domain; Governmental Action</u>. If, prior to the Closing Date: (a) any proceedings are instituted, or notice of proposed proceedings are received, to take any portion of the Property by eminent domain, or (b) any moratorium or related action is enacted with respect to the Property, or any part thereof, or (c) proceedings are commenced to alter, change or amend the zoning classifications or land use restrictions affecting the Property, or (d) a governmental entity determines that the Property cannot be operated and developed in accordance with law existing as of the date of this Agreement, the Buyer shall have the right to terminate this Agreement by giving written notice to the Seller within ten (10) days after the Buyer has received written notice of such proceedings or actions. The Seller shall immediately furnish the Buyer with written notification of any such action or proceedings as soon as the Seller received notice of them. Should this Agreement be terminated as a result of any such proceedings or actions, the Deposit and all interest earned thereon, less any escrow expenses or fees chargeable to the Buyer shall promptly be returned to the Buyer. If the Buyer does not elect to terminate this Agreement, all proceeds of any eminent domain proceeding shall belong to the Buyer and the Seller shall assign the Seller's right to such proceeds to the Buyer at closing.

15. <u>Risk of Loss</u>. Except as hereinafter specifically provided, all risk of loss to the Property shall be borne solely by the Seller prior to the Closing Date and by the Buyer from and after the Closing Date. If, prior to Closing, the Property is damaged by fire or other casualty to the extent of One Hundred Thousand and No/100 Dollars ($100,000) or more in aggregate value, the Buyer shall have the right, upon written notice to the Seller within twenty (20) days after receiving written notice of such loss or damage, either (a) to terminate this Agreement, in which case neither party shall have any further rights, obligations or liability hereunder, and the Deposit



and interest thereon, less any escrow expenses or fees chargeable to the Buyer shall be refunded to the Buyer, or (b) to take title to the Property nevertheless without any reduction in the Purchase Price, and in such case the Seller shall assign or cause to be assigned to the Buyer the Seller's right to receive and collect the proceeds of any insurance maintained against such loss. If, prior to Closing, the Property or any part thereof, is damaged by fire or other casualty to the extent of less than One Hundred Thousand and No/100 Dollars ($100,000) in aggregate value, this transaction shall be completed without any reduction of the Purchase Price, provided the loss is fully covered by insurance and the Seller assigns or causes to be assigned to the Buyer the Seller's right to receive and collect the proceeds of any insurance maintained against such loss which in no event will be less than the full repair and replacement costs of such loss.

     16.    Adjustments and Prorations. All receipts and disbursements of the Property will be prorated on the Closing Date and the Purchase Price will be adjusted on the following basis:

     16.01  Rents. All rents receivable from tenants of the Property earned and attributable to the period prior to the Closing Date will be paid to the Seller to the extent that such rents have been earned and collected on or before the Closing date; rents earned and attributable to the period beginning on the Closing Date and thereafter will be paid to the Buyer. Rents earned by the Property prior to the Closing Date but received by the Buyer on or after the Closing Date will be paid to the Seller upon receipt by Buyer; provided, that the Buyer will have no obligation to enforce collection of such rents that would be payable to Seller.

     16.02  Property Taxes. All real and personal property ad valorem taxes and installments of special assessments, if any, for the calendar years preceding the year in which the Closing Date occurs will be paid by Seller. All real and personal property of valorem taxes and special assessments, if any, whether payable in installments or not, for the calendar year in which the Closing Date occurs will be prorated to the Closing Date (whether paid in advance or paid in arrears), based on the latest available tax rate and assessed valuation on the calendar year tax proration method with the Buyer responsible for the day of closing.

     16.03  Utility Charges. All utility charges, if any, will be paid by Seller up to and including the Closing Date and Buyer and Seller will obtain a final billing and transfer service to Buyer as of the closing date. All utility security deposits, if any, will be retained by Seller.

     17.    Condition of Property "AS IS". Buyer acknowledges that it will conduct its own inspection of the Property and review of such documents and records as it deems necessary or appropriate concerning the Property. Except as set forth in this Agreement, the Property is being sold "AS IS," without any statements, representations or warranties by Seller concerning the state, use or condition of the Property. Except as set forth in this Agreement, Buyer is relying solely on its own inspection, investigation and analysis of the foregoing matters in executing this Agreement and except as set forth in this Agreement and is not relying in any way upon any statements, representations, warranties, documents, materials or information provided by Seller, whether oral or written, express or implied, of any nature whatsoever regarding any of the foregoing matters except statements that the copies of written materials are true, correct and complete copies of the materials they purport to be and any statements or representations that



specifically survive after closing per this Agreement. The Assignment of Lease and other conveyance documents will contain a disclaimer of any promises or statements by Seller about the Property, which are not set forth in this Agreement. Neither Seller's employees, agents, nor any other person is authorized to make any representations about the state, condition or use of the Property. Any statements of such nature are not to be attributed to Seller, except to the extent they appear in the warranties and representations set forth in this Agreement.

18.　　Closing Costs. The Seller shall pay the costs of preparing the conveyance documents, recording fees to clear title and record the conveyance documents, the Seller's notary fees, the conveyance tax, real estate commission, the cost of the Survey and (if stakes are missing) staking of the Property, the cost of a certificate of title and one-half of the escrow fees. The Buyer shall pay the Buyer's notary fees, the difference between the cost of a certificate of title and the cost of the Title Policy, one-half of the escrow fees, the cost of preparing any mortgage documents, the cost of any lender's title policy, and all recording fees for any mortgage documents.

19.　　Real Estate Brokers. The Buyer and Seller both acknowledge that RAW Enterprises, Inc. ("Broker") represents the Buyer under this Agreement and that a commission in the amount of four percent (4%) of the Buyer's Successful Bid will be paid to the Broker by the Seller through Escrow at closing. Neither the Seller nor the Buyer have knowledge of any other real estate broker, consultant or any finder in connection with, or making any claim for a commission in connection with, the transaction contemplated by this Agreement, and the Seller and the Buyer each represent and warrant to the other that such party has not committed any act or suffered any act to be committed so as to create any liability or give rise to a claim for a real estate brokerage commission or finder's fee to any other person or entity except as stated above.

20.　　Default.

20.01　Buyer's Default. Upon the Buyer's failure and mutual breach in failing to close escrow for the purchase of the Property through no fault of the Seller (except in the case of termination of this Agreement by the Buyer as may be permitted by and in accordance with this Agreement), the Seller shall, as its sole and exclusive remedy for Buyer's material breach and default be entitled to retain the Deposit, plus accrued interest thereon, if any, as liquidated damages, in which case this Agreement shall terminate and both parties shall be released from their obligations hereunder, and neither party shall have any further liability to the other.

20.02　Seller's Default. Upon the Seller's failure to close the sale of the Property on the Closing Date through no fault of the Buyer, the Deposit, together with any interest thereon, shall be returned to the Buyer, and, in addition, the Buyer may sue the Seller for specific performance and/or damages, and may exercise any and all rights or remedies, whether at law or in equity.

21.　　Notices. Any notice required or permitted to be given under this Agreement shall be given in writing. Written notice shall be deemed to have been given when deposited in a United States Post Office, registered or certified mail, postage prepaid, return receipt requested, and addressed as follows or sent by facsimile transmissions as follows:



|            |                                  |
|------------|----------------------------------|
| Buyer:     | Adobe/Avery Parkway, LLC         |
|            | 301 Forest Ave.                  |
|            | Laguna Beach, CA 92651           |
|            |                                  |
| Buyer's Attorney: | Danton S. Wong, Esq.      |
|            | Chun Kerr LLP                    |
|            | 745 Fort Street, 9th Floor       |
|            | Honolulu, Hawaii 96813           |
|            |                                  |
| Seller:    | Pomare, Ltd.                     |
|            | 700 N. Nimitz Highway            |
|            | Honolulu, Hawaii 96817           |
|            | Attn: Mr. Mark J. Storfer        |
|            |                                  |
| Seller's Attorney: | James A. Wagner, Esq.    |
|            | Wagner Choi & Verbrugge          |
|            | 745 Fort Street, Suite 1900      |
|            | Honolulu, Hawaii 96813           |

or to such other address as either party from time to time may specify in writing to the other.

   21.01   <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective permitted successors and assigns.

   21.02   <u>Assignability</u>.  Except as provided in this Paragraph 21.02, this Agreement and the rights, interests and obligations of the parties hereunder shall not be assignable by either party hereto without the prior written consent of the other party hereto, and any assignment made without such consent shall be <u>void ab initio</u> and the assignee shall acquire no rights by reason of such assignment.  Notwithstanding the foregoing, this Agreement is assignable by the Buyer to a limited partnership in which it is a general partner or a limited liability company in which it is the managing member or its assignee or a corporation in which it is the majority shareholder.

   21.03   <u>Amendment and Termination</u>.  This Agreement may be amended or modified by, and only by, a written instrument executed by the Seller and the Buyer.

   21.04   <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Hawaii, and the provisions of the United States Bankruptcy Code and related statutes.



21.05  Section Headings.  The section headings inserted in this Agreement are for convenience only and are not intended to, and shall not be construed to limit, enlarge or affect the scope or intent of this Agreement nor the meaning of any provisions hereof.

21.06  Merger of Prior Agreements.  This Agreement supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

21.07  No Party Deemed Drafter.  The parties agree that no party shall be deemed to be the drafter of this Agreement and, further, that if this Agreement is ever construed by a court of law, such court shall not construe this Agreement or any provision thereof against any party as the drafter of this Agreement.

21.08  Time is of the Essence.  Time is of the essence of this transaction.  Neither party shall have any right to extend the Closing Date without the express, written consent of the other party, which consent may be withheld in the consenting parties sole and absolute discretion.

21.09  Counterparts and Facsimile Signatures.  It is agreed that electronic copies (including electronic or email, facsimile or similar digital copy, photo or image collectively referred to as "Electronic Copies") of this Agreement and any related documents will be fully binding and effective for all purposes whether or not originally executed documents are transmitted to Seller, Buyer, or Escrow.  Electronic signatures on documents or Electronic Copies will be treated the same as original signatures.  However, each party agrees that it will promptly forward a hand signed copy of this Agreement as well as originally executed closing documents to Escrow.  It is further agreed that this Agreement may be signed in any number of counterparts and by different parties in separate counterparts, each of which when so signed will be considered an original, and all of them put together will form one and the same document, binding upon all of the parties, even though all signatures are not on one copy of the Agreement.

21.10  Jurisdiction/Disputes.  The Parties agree that the United States Bankruptcy Court for the District of Hawaii shall have sole jurisdiction to determine any and all disputes that may arise under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

POMARE, LTD., dba Hilo Hattie,
a Hawaii corporation

By:  _____
        Mark J. Storfer
Its:    Executive Vice President and
        Chief Operating Officer



21.05  <u>Section Headings</u>.  The section headings inserted in this Agreement are for convenience only and are not intended to, and shall not be construed to limit, enlarge or affect the scope or intent of this Agreement nor the meaning of any provisions hereof.

21.06  <u>Merger of Prior Agreements</u>.  This Agreement supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

21.07  <u>No Party Deemed Drafter</u>.  The parties agree that no party shall be deemed to be the drafter of this Agreement and, further, that if this Agreement is ever construed by a court of law, such court shall not construe this Agreement or any provision thereof against any party as the drafter of this Agreement.

21.08  <u>Time is of the Essence</u>.  Time is of the essence of this transaction.  Neither party shall have any right to extend the Closing Date without the express, written consent of the other party, which consent may be withheld in the consenting parties sole and absolute discretion.

21.09  <u>Counterparts and Facsimile Signatures</u>.  It is agreed that electronic copies (including electronic or email, facsimile or similar digital copy, photo or image collectively referred to as "Electronic Copies") of this Agreement and any related documents will be fully binding and effective for all purposes whether or not originally executed documents are transmitted to Seller, Buyer, or Escrow.  Electronic signatures on documents or Electronic Copies will be treated the same as original signatures.  However, each party agrees that it will promptly forward a hand signed copy of this Agreement as well as originally executed closing documents to Escrow.  It is further agreed that this Agreement may be signed in any number of counterparts and by different parties in separate counterparts, each of which when so signed will be considered an original, and all of them put together will form one and the same document, binding upon all of the parties, even though all signatures are not on one copy of the Agreement.

21.10  Jurisdiction/Disputes.  The Parties agree that the United States Bankruptcy Court for the District of Hawaii shall have sole jurisdiction to determine any and all disputes that may arise under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

POMARE, LTD., dba Hilo Hattie,
a Hawaii corporation

By: _____

Digitally signed by Mark Storfer
DN: cn=Mark Storfer, o=Pomare, Ltd,
ou, email=MStorfer@HiloHattie.com,
c=US
Date: 2015.05.15 15:41:22 -10'00'

Mark J. Storfer
Its:  Executive Vice President and
Chief Operating Officer

ADOBE/AVERY PARKWAY, LLC,
a California limited liability company

By: _____

Its: *MANAGER*

## PRELIMINARY REPORT
(No Liability Hereunder)


This report (and any revisions thereto) is issued solely for the
convenience of the titleholder, the titleholder's agent, counsel,
purchaser or mortgagee, or the person ordering it for the purpose of
facilitating the issuance of a policy of title insurance by Title
Guaranty of Hawaii and no liability will arise under this report.

---------------------------------------------

## SCHEDULE A


Title Guaranty of Hawaii, Incorporated, hereby reports that, subject
to those matters set forth in Schedule "B" hereof, the title to the
estate or interest to the land described in Schedule "C" hereof is
vested in:



POMARE, LTD.,
a Hawaii corporation,
as Lessee




This report is dated as of July 15, 2014 at 8:00 a.m.


Inquiries concerning this report
should be directed to
LISA NAGATA.
Email lnagata@tghawaii.com
Fax (808) 521-0287
Telephone (808) 533-5821.
Refer to Order No. 201431032.



# EXHIBIT A

© **Title Guaranty of Hawaii, Inc.**
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

## SCHEDULE B
## EXCEPTIONS

1. Real Property Taxes, if any, that may be due and owing.

   Tax Key: (1) 1-5-013-018   Area assessed: 60,679 sq. ft.
                              - covers Parcel First, Lot C

   Tax Key: (1) 1-5-013-003   Area assessed: 4,948 sq. ft.
                              - covers Parcel Second, Lot 30-B-1 &
                              Parcel Third, Lot D-1

   Tax Key: (1) 1-5-013-004   Area assessed: 16,614 sq. ft.
                              - covers Parcel Second, Lot 30-B-2 &
                              Parcel Third, Lot D-2

2. Mineral and water rights of any nature in favor of the State of Hawaii.

3. -AS TO PARCEL FIRST:-

   (A)   NOTICE OF PENDENCY OF ACTION, L. No. 18604, in favor of the STATE OF HAWAII, to acquire title to portions of Lot C, dated October 23, 1947, filed as Land Court Document No. 96035.

   (B)   NOTICE OF PENDENCY OF ACTION, L. No. 20196, in favor of the STATE OF HAWAII, to acquire abutter's rights of vehicle access appurtenant to Lot C, dated September 2, 1949, filed as Land Court Document No. 112472.

   -Note:-   Final Order of Condemnation, filed March 16, 1953, in favor of the Territory of Hawaii (now State of Hawaii). (Not noted on Transfer Certificate of Title No. 145,205)

   (C)   Restriction of access rights, as shown on Map 16, as set forth by Land Court Order No. 11868, filed March 19, 1953.

© Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

SCHEDULE B CONTINUED


(D)    Easement "14" for water pipeline purposes, as shown on Map
       32, as set forth by Land Court Order No. 66634, filed July
       25, 1983.


(E)    GRANT to CITY AND COUNTY OF HONOLULU, dated November 4,
       1983, filed as Land Court Document No. 1206066; a right and
       easement over said Easement "14".


4.    -AS TO PARCEL SECOND:-


(A)    Easement "18" (10 feet wide) for pipeline purposes in favor
       of Honolulu Gas Company, Limited, over and across Lot 30-B-
       2, as shown on Map 2 of Land Court Application No. 1758.


(B)    Easement "19" over and across Lot 30-B-2, as shown on Map 2
       of Land Court Application No. 1758.


(C)    Easement "20" over and across Lot 30-B-1, as shown on Map 2
       of Land Court Application No. 1758.


(D)    Easement "21" (10 feet wide) for oil pipeline purposes in
       favor of Standard Oil Company of California, situate over
       and across Lot 30-B-1, as shown on Map 2 of Land Court
       Application No. 1758.


(E)    Restriction of access rights in favor of the State of
       Hawaii, pursuant to two Final Orders of Condemnation, Law
       No. 20196, the first being recorded in the Bureau of
       Conveyances of the State of Hawaii in Liber 2412 at Page
       93, and the second being unrecorded, the portions affected
       thereby being shown on said Map 2.

SCHEDULE B CONTINUED


(F)  Possible future restriction of access rights as set forth
     in the Petition and Lis Pendens of Law 21290, Territory of
     Hawaii (now State of Hawaii) vs. Inter-Island Steam
     Navigation Company, Limited, the portions affected thereby
     being shown on said Map 2; nothing herein to be deemed to
     restrict access or to affect the rights of the Oahu Railway
     and Land Company to compensation for such restriction, such
     portion being shown on said Map 2 solely for future
     convenience in description.


5.  -AS TO PARCEL THIRD:-


(A)  The terms and provisions contained in the that certain pipe
     line license or agreement with the UNION OIL COMPANY OF
     CALIFORNIA, by AGREEMENT dated January 25, 1923, subject to
     termination as therein provided.

(B)  NOTICE OF PENDENCY OF ACTION, L. No. 18604, in favor of the
     STATE OF HAWAII to acquire title to portions of Lot C,
     dated October 23, 1947, filed as Land Court Document No.
     96035.


6.  The terms and provisions contained in Lease referred to in
    Schedule C.

    The foregoing includes, but is not limited to the matter relating
    to consent by the Lessor for any assignment or subletting.


7.  Any facts, rights, interests or claims which are not shown by the
    public records, but which could be ascertained by making inquiry
    of the lessors in the lease or leases described or referred to in
    Schedule C.

SCHEDULE B CONTINUED


8.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments or any other matters which a correct survey or archaeological study would disclose.


9.  Any unrecorded leases and matters arising from or affecting the same.


## END OF SCHEDULE B

U.S. Bankruptcy Court - Hawaii #15-00285 Dkt # 215 Filed 06/01/15 Page 30 of 87
235 QUEEN ST., HONOLULU, HAWAII 96813, PH (808) 533-6261

# SCHEDULE C

UNRECORDED LEASE

LESSOR       :   HONOLULU LIMITED, a Hawaii corporation

LESSEE       :   JAMES STEWART ROMIG, unmarried

DATED        :   August 24, 1982
TERM         :   approximately 56 years commencing on August 24,
                 1982 and terminating 55 years and 90 days after
                 the issuance of a final certificate of occupancy
                 or the equivalent for the improvements to be
                 constructed on the premises by the Lessor

A Short Form Lease is dated August 24, 1982, filed as Land Court
Document No. 1134417.


THE LESSEE'S INTEREST BY MESNE ASSIGNMENTS ASSIGNED

ASSIGNOR     :   JAMES S. ROMIG, as Trustee of the James S. Romig
                 Revocable Living Trust dated August 15, 1980

ASSIGNEE     :   POMARE, LTD., a Hawaii corporation

DATED        :   July 11, 2003
FILED        :   Land Court Document No. 3051053

CONSENT      :   Given by HONOLULU LIMITED, a Maryland corporation,
                 by instrument dated November 26, 2003, filed as
                 Land Court Document No. 3051054, and by 3900
                 CORP., a Maryland corporation, by instrument dated
                 November 26, 2003, filed as Land Court Document
                 No. 3051055.


Said Lease demising the following described premises:

All of those certain parcels of land situate at Kaholaloa, Honolulu,
City and County of Honolulu, State of Hawaii, described as follows:

© Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813  PH: (808) 533-6261

-PARCEL FIRST:-

LOT C, area 1.393 acres, more or less, as shown on Map 1, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1056 of Oahu Railway and Land Company.

Together with right of way over all roads now existing on Lot A-1 as shown on Map 5; Lot(s) A-2-A, A-2-B, A-3-B, A-3-C and A-3-D, as shown on Map 12; Lot 10 as shown on Map 27; Lot F-2 as shown on Map 11; and Lot 6 as shown on Map 26; all being a portion of said application, as reserved in Land Court Document No. 282601.

Being land(s) described in Transfer Certificate of Title No. 145,205 issued to Honolulu Limited, a Hawaii corporation.

-PARCEL SECOND:-

LOTS:  30-B-1, area  2,808 square feet, and
       30-B-2, area 11,474 square feet, more or less, as shown on Map 9, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1758 (amended) of Oahu Railway and Land Company.

Being land(s) described in Transfer Certificate of Title No. 217,231 issued to Honolulu Limited, a Hawaii corporation.

-PARCEL THIRD:-

LOTS:  D-1, area 2,140 square feet, and
       D-2, area 5,140 square feet, more or less, as shown on Map 31, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1056 of Oahu Railway and Land Company;

Being land(s) described in Transfer Certificate of Title No. 270,030 issued to Honolulu Limited, a Hawaii corporation.

**END OF SCHEDULE C**

# GENERAL NOTES

1. There is hereby omitted from any covenants, conditions and reservations contained herein any covenant or restriction based on race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law. Lawful restrictions under state or federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

2. CERTIFICATE OF MERGER dated January 2, 1998, recorded as Document No. 98-082916 sets forth the following filed with the Department of Commerce and Consumer Affairs, effective on December 31, 1997:

   (A) That HONOLULU LIMITED, a Hawaii corporation, was merged with and into HJW/HONOLULU, INC., a Maryland corporation, and surviving corporation is HJW/HONOLULU, INC.; and

   (B) The name change of HJW/HONOLULU, INC. has changed it's name to HONOLULU LIMITED, a Maryland corporation.

   (A Land Court Petition may be required because the above is not noted on Transfer Certificate(s) of Title referred to herein)

U.S. Bankruptcy Court - Hawaii #14-01205 Dkt # 215 Filed 06/01/15 Page 33 of 87

# GUIDELINES FOR THE ISSUANCE OF INSURANCE

A. Taxes shown in Schedule B are as of the date such information is available from the taxing authority. Evidence of payment of all taxes and assessments subsequent to such date must be provided prior to recordation.

B. Evidence of authority regarding the execution of all documents pertaining to the transaction is required prior to recordation. This includes corporate resolutions, copies of partnership agreements, powers of attorney and trust instruments.

C. If an entity (corporation, partnership, limited liability company, etc.) is not registered in Hawaii, evidence of its formation and existence under the laws where such entity is formed must be presented prior to recordation.

D. If the transaction involves a construction loan, the following is required:

   (1) a letter confirming that there is no construction prior to recordation; or

   (2) if there is such construction, appropriate indemnity agreements, financial statements and other relevant information from the owner, developer, general contractor and major sub-contractors must be submitted to the Title Company for approval at least one week prior to the anticipated date of recordation.

   Forms are available upon request from Title Guaranty of Hawaii.

E. Chapter 669, Hawaii Revised Statutes, sets forth acceptable tolerances for discrepancies in structures or improvements relative to private property boundaries for various classes of real property. If your survey map shows a position discrepancy that falls within the tolerances of Chapter 669, call your title officer as affirmative coverage may be available to insured lenders.

F. The right is reserved to make additional exceptions and/or requirements upon examination of all documents submitted in connection with this transaction.

G. If a policy of title insurance is issued, it will exclude from coverage all matters set forth in Schedule B of this report and in the printed Exclusions from Coverage contained in an ALTA policy or in the Hawaii Standard Owner's Policy, as applicable. Different forms may have different exclusions and should be reviewed. Copies of the policy forms are available upon request from Title Guaranty of Hawaii or on our website at www.tghawaii.com.

U.S. Bankruptcy Court - Hawaii #14-00303 Dkt # 12 Filed 06/01/15   Page 34 of 87
235 QUEEN ST., HONOLULU, HAWAII 96813   Ph (808) 533-6261

DATE PRINTED:  3/26/2015

STATEMENT OF ASSESSED VALUES AND REAL PROPERTY TAXES DUE

TAX MAP KEY

DIVISION ZONE SECTION PLAT PARCEL HPR NO.
(1)      1     5          013   018   0000

CLASS: INDUSTRIAL                    AREA ASSESSED:      60,679 SF

ASSESSED VALUES FOR CURRENT YEAR TAXES:  2014

The records of this division show the assessed values and taxes on
the property designated by Tax Key shown above are as follows:

```
              BUILDING       $          0
              EXEMPTION      $          0
              NET VALUE      $          0
              LAND           $  4,702,400
              EXEMPTION      $          0
              NET VALUE      $  4,702,400
              TOTAL NET VALUE $ 4,702,400
```

Installment  (1 - due 8/20;  2 - due 2/20)      Tax Info As Of -  8/20/2014

| Tax Year | Installment | Tax Amount | Penalty Amount | Interest Amount | Other Amount | Total Amount | |
|----------|-------------|-----------|----------------|-----------------|--------------|--------------|---|
| 2014 | 2 | 29,154.88 | | | | 29,154.88 | PENDING |
| 2014 | 1 | 29,154.88 | 1,749.30 | 618.08 | | 31,522.26 | DELINQUENT |
| 2013 | 2 | 28,262.70 | 2,826.27 | 2,487.12 | | 33,576.09 | DELINQUENT |
| 2013 | 1 | 28,262.70 | 2,826.27 | 4,352.46 | | 35,441.43 | DELINQUENT |

Total Amount Due:      129,694.66

Penalty and Interest Computed to:  8/20/2014

U.S. Bankruptcy Court - Hawaii  #14-00203  Dkt # 215  Filed 06/01/15  Page 35 of 87

DATE PRINTED:  3/26/2015

STATEMENT OF ASSESSED VALUES AND REAL PROPERTY TAXES DUE

TAX MAP KEY

DIVISION ZONE SECTION PLAT PARCEL HPR NO.
  (1)    1     5    013   003   0000

CLASS: INDUSTRIAL               AREA ASSESSED:     4,948 SF

ASSESSED VALUES FOR CURRENT YEAR TAXES:  2014

The records of this division show the assessed values and taxes on
the property designated by Tax Key shown above are as follows:

```
                    BUILDING      $  8,391,200
                    EXEMPTION     $          0
                    NET VALUE     $  8,391,200
                    LAND          $    339,400
                    EXEMPTION     $          0
                    NET VALUE     $    339,400
                    TOTAL NET VALUE $ 8,730,600
```

Installment  (1 - due 8/20;  2 - due 2/20)    Tax Info As Of -  8/20/2014

| Tax Year | Installment | Tax Amount | Penalty Amount | Interest Amount | Other Amount | Total Amount | |
|---|---|---|---|---|---|---|---|
| 2014 | 2 | 54,129.72 | | | | 54,129.72 | PENDING |
| 2014 | 1 | 54,129.72 | 3,247.78 | 1,147.55 | | 58,525.05 | DELINQUENT |
| 2013 | 2 | 53,962.94 | 5,396.30 | 4,748.74 | | 64,107.98 | DELINQUENT |
| 2013 | 1 | 53,962.94 | 5,396.30 | 8,310.29 | | 67,669.53 | DELINQUENT |

Total Amount Due:   244,432.28

Penalty and Interest Computed to:  8/20/2014

DATE PRINTED: 3/26/2015

STATEMENT OF ASSESSED VALUES AND REAL PROPERTY TAXES DUE

TAX MAP KEY

DIVISION ZONE SECTION PLAT PARCEL HPR NO.
   (1)   1    5     013   004   0000

CLASS: INDUSTRIAL           AREA ASSESSED:    16,614 SF

ASSESSED VALUES FOR CURRENT YEAR TAXES: 2014

The records of this division show the assessed values and taxes on the property designated by Tax Key shown above are as follows:

| | | |
|---|---|---:|
| BUILDING | $ | 0 |
| EXEMPTION | $ | 0 |
| NET VALUE | $ | 0 |
| LAND | $ | 1,139,700 |
| EXEMPTION | $ | 0 |
| NET VALUE | $ | 1,139,700 |
| TOTAL NET VALUE | $ | 1,139,700 |

Installment (1 - due 8/20; 2 - due 2/20)    Tax Info As Of - 8/20/2014

| Tax Year | Installment | Tax Amount | Penalty Amount | Interest Amount | Other Amount | Total Amount | |
|---|---|---|---|---|---|---|---|
| 2014 | 2 | 7,066.14 | | | | 7,066.14 | PENDING |
| 2014 | 1 | 7,066.14 | 423.97 | 149.80 | | 7,639.91 | DELINQUENT |
| 2013 | 2 | 6,849.76 | 684.98 | 602.78 | | 8,137.52 | DELINQUENT |
| 2013 | 1 | 6,849.76 | 684.98 | 1,054.86 | | 8,589.60 | DELINQUENT |
| | | | | Total Amount Due: | | 31,433.17 | |

Penalty and Interest Computed to: 8/20/2014

# EXHIBIT "B"

## MASTER DUE DILIGENCE CHECKLIST

<u>Item</u>

1.   Title to land or master lease if it is a leasehold Property, including, but not limited to, any existing, threatened, or proposed lawsuits of which Seller has knowledge.

2.   All encumbrances, liens, or other defects or clouds on the title to the Property, whether recorded or unrecorded.

3.   Hazardous waste studies and citations (if any).

4.   All leases related to the Property.

5.   All existing construction plans, specifications, third party reports, surveys or drawings in Seller's possession.

6.   All management and contract agreements related to the Property.

7.   All communication between Seller and any Governmental Authorities concerning the Property.

8.   All other information that would be necessary for the Buyer to evaluate the transaction.

9.   Seller will turn over all leasing and sale leads or prospects for the Property to the Buyer after this LOI is signed.

Buyer shall investigate, inspect and study the Property to determine if all aspects of the Property are acceptable to Buyer, in Buyer's sole and absolute discretion, including but not limited to, all improvements thereon and including, without limitation, status of title, survey results, zoning classification of the Property, availability and adequacy of all utilities, availability and receipt of all approvals and permits from the local municipality and all necessary county, state and federal agencies as required for Buyer's intended use of the Property, rezoning of the Property and receipt of special land use approval, if needed, for the Buyer's intended use of the Property, the economic suitability and feasibility of the Property for the Buyer's intended use, availability of financing acceptable to Buyer, availability of sufficient parking to serve Buyer's intended use, review and acceptance of environmental and geo-technical inspections, review and acceptance of the physical condition of the Property, including subsurface conditions, availability of adequate access to the Property by public or private roadway or acceptable easements, review of all leases, service contracts, and statements of income and expenses pertaining to the Property and review and approval of such other matters as Buyer shall deem necessary for its intended use of the Property.



IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

In re

POMARE, LTD., dba
HILO HATTIE

      Debtor and
      Debtor-in-Possession.

74314v5

BK. NO. 15-00203
(Chapter 11)

## BID PROCEDURES

As contemplated by and incorporated in that certain bid procedures order (the "Bid Procedures Order"), the following procedures ("Bid Procedures") shall be the exclusive mechanism governing any disposition of the Property in any form or structure to the Successful Bidder on the terms and conditions of the Successful Bid and the associated Purchase Documents.

1. **Certain Defined Terms:**

    (a) "Purchase" means the transfer of the Property to the Successful Bidder pursuant to the Purchase Agreement, as amended by the Successful Bidder, if other than the Buyer.

    (b) "Purchase Agreement" means that certain agreement between the Debtor and the Buyer pursuant to which the Buyer has offered to acquire the Property.

    (c) "Purchase Documents" means the Purchase Agreement and any other document deemed necessary or appropriate to effectuate the Purchase.

    (d) "Bankruptcy Court" means the United States Bankruptcy Court for the District of Hawaii.

# EXHIBIT C

(e)     "<u>Breakup Fee</u>" means $250,000, payable in cash pursuant to these Bid Procedures and the Bid Procedures Order.

(f)     "<u>Buyer</u>" means a special purpose entity to be created by Adobe/Avery Parkway, LLC ("Adobe") and co-investors selected by Adobe.

(g)     "<u>Buyer's Bid</u>" means Buyer's offer in the amount of $4,800,000, as set forth in the Purchase Agreement.

(h)     "<u>Committee</u>" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

(i)     "<u>Debtor</u>" means Pomare, Ltd., dba Hilo Hattie.

(j)     "<u>Initial Minimum Overbid</u>" means the first Qualified Bid after Buyer's Bid that at a minimum must be $5,100,000, in cash, or such other offer that the Debtor determines to be the economic equivalent of a $5,100,000 cash bid.

(k)     "<u>LOI</u>" means that certain Letter of Intent ("LOI") dated March 25, 2015, executed by the Debtor and the Buyer, and filed with the Bankruptcy Court.

(l)     "<u>Property</u>" means that certain leasehold parcel of real property located at 700 North Nimitz Highway, Honolulu, Hawaii 96817, as more particularly described in Exhibit A, attached hereto and incorporated by reference.

## 2.    Determining Potential Bidders

To participate in the bidding process and to receive non-public information concerning the Property, each person or entity other than the Buyer ("Potential Bidder") must deliver to the Debtor and the Buyer the following materials ("Potential Bid Package"):

(a)    *Non-Binding Indication of Interest.*

An executed non-binding indication of interest at a price at least equal to the Initial Minimum Overbid.

(b)    *Confidentiality Agreement.*

An executed confidentiality agreement in a form reasonably acceptable to the Debtor. It is contemplated that the form of confidentiality agreement proposed by the Debtor shall be substantially similar for all Potential Bidders.

2

(c)     *Identification of Bidder.*

Each Potential Bid Package shall identify the Potential Bidder and the Bidder's Sponsors (if any), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

(d)     *Corporate Authority.*

Each Potential Bid Package shall contain written evidence of the Potential Bidder's Board of Directors' (or comparable governing body) approval of the proposed Purchase; *provided*, *however*, that, if the Potential Bidder is an entity specially formed for the purpose of acquiring the Property, then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the contemplated transactions by the Board of Directors (or comparable governing body) of each of the equity holder(s) of the Potential Bidder ("Bidder's Sponsors").

(e)     *Proof of Financial Ability to Perform.*

Each Potential Bidder must provide evidence that the Debtor reasonably concludes demonstrates the Potential Bidder has the necessary financial ability to close the Purchase. Such information should include, inter alia, the following:

(i)     contact names and numbers for verification of financing sources,

(ii)    evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Purchase, which commitments shall not be contingent or conditional; and

(iii)   Any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor, demonstrating that such Potential Bidder has the ability to close the Purchase;

3

The Debtor shall determine, in its reasonable discretion, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications.

**3.     Determination of Potential Bidders; Notification**

(a)     *Determination of Potential Bidders.*

Within five (5) business day after the submission of a Potential Bid Package, the Debtor shall determine whether that party qualifies as a Potential Bidder.  The Debtor shall have the discretion to determine whether a party may be a Potential Bidder based upon the content of the Potential Bid Package, as well as commercial and competitive considerations.

*(b)     Notification of Potential Bidders.*

Upon determining that a party is a Potential Bidder, the Debtor shall immediately thereafter notify the Buyer, the Committee, and each Potential Bidder in writing. Contemporaneous with notifying a party that it is a Potential Bidder, the Debtor shall provide that Potential Bidder with access to the same confidential, evaluation materials and information provided by the Debtor to the Buyer and each other Potential Bidder, which shall include financial information and other data related to the Property and/or such other information as the Potential Bidder may reasonably request.  If the Debtor furnishes any information related to the Debtor not heretofore given to the Buyer, then the Debtor shall make such information available to the Buyer and each Potential Bidder.

4

### 4. Determining Qualified Bids and Qualified Bidders

*(a)     Terms and Conditions of a Qualified Bid.*

Each offer, solicitation or proposal ("Bid") from a Potential Bidder must satisfy each of the following conditions to be deemed a "Qualified Bid" and for the Potential Bidder to be deemed a "Qualified Bidder":

(i)     Nature of Bids.

A Bid shall include a copy of the Purchase Agreement marked to show all changes requested by the Potential Bidder (including those related to purchase price), shall not be subject to any financing or due diligence contingencies, and must remain open and binding on the Potential Bidder until and unless the Auction, as defined below, concludes or the Debtor receives and accepts a higher Bid at the Auction. The Debtor may conclude, in its reasonable business judgment, that any changes to the Purchase Agreement are detrimental to unsecured creditors or the estate and based on such determination decline to designate a Potential Bidder as a Qualified Bidder. In addition, the Potential Bidder must deliver a fully executed copy of the Potential Bidder's proposed Purchase Agreement, including any increased bid at the Auction, which Purchase Agreement shall be binding on the Potential Bidder if its Bid is accepted as the best Bid by the Debtor at the Auction.

(ii)     Initial Minimum Overbid.

The consideration proposed by the Initial Minimum Overbid, if any, shall be cash or cash equivalents that equal or exceed the sum of $5,100,000.

(iii)     No Bid Protections for Potential Bidders.

A Bid may not request any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, neither the tendering of a Bid nor the determination that a

5

Bid is a Qualified Bid shall entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

(iii)  Bid Deadline.

Regardless of when a party qualifies as a Potential Bidder, the Debtor must receive a Bid in writing, on or before the "Bid Deadline," which shall be July 27, 2015, at 4:00 p.m., Hawaii Standard Time.  The Bid shall be delivered to Seller's counsel, Wagner Choi & Verbrugge, 745 Fort Street, Suite 1900, Honolulu, Hawaii 96813.

(iv)  Cash Deposit.

Each Bid, other than Buyer's bid, must be accompanied by a $250,000 USD cash deposit payable to a non-interest bearing escrow account to be identified and established by the Debtor. The deposit of the Successful Bidder shall be increased to 10% of the consideration included in the Successful Bid within three (3) business days after the Successful Bid is approved by the Bankruptcy Court.

(v)  Refund of Deposits

In the event any Potential Bidder is determined by the Debtor not to be a Qualified Bidder, the Potential Bidder shall be refunded its deposit and all accumulated interest thereon, if any, within three (3) business days after that determination.  Each Qualified Bidder, including Buyer, other than the Successful Bidder shall be refunded its deposit and all accumulated interest thereon, if any, within three (3) business days after the selection of the Successful Bid.

(b)  *Qualified Bidders.*

Pursuant to the terms and conditions set forth in this § 4(b), the Debtor shall identify and notify all bidders whether they are Qualified Bidders by July 30, 2015.  Any party may seek the Court's review of the Debtor's determination whether a Potential Bidder is a Qualified Bidder;

6

*provided*, *however*, that any such challenge must be raised and concluded prior to the commencement of the Auction. The Debtor's determination of the Qualified Bidders shall become irrevocable and unreviewable once the Auction has commenced.

(i)      Buyer.

Notwithstanding anything in these Bid Procedures to the contrary, the Buyer is deemed a Qualified Bidder, and the Buyer's Bid set forth in the Purchase Agreement shall be deemed a Qualified Bid, for all applicable purposes under these Bid Procedures.

(ii)     Other Qualified Bidders.

Each Bid received from a Potential Bidder that satisfies each of the conditions set forth herein shall constitute a "Qualified Bid" and the bidder shall be deemed a "Qualified Bidder."

## 5.   Notice of the Auction or of Absence of Qualified Bids

If the Debtor receives a Qualified Bid other than the Buyer's Bid, an auction ("Auction") will be held on August 7, 2015, at the offices of Seller's counsel, Wagner Choi & Verbrugge, 745 Fort Street, Suite 1900, Honolulu, Hawaii 96813, or at any such other location as the Debtor may hereafter designate. On or prior to 5:00 p.m., Hawaii Standard Time, August 4, 2015, the Debtor shall provide to Buyer and each Qualified Bidder that has submitted a Qualified Bid:

a) Written notice of the Auction; and

b) Copies of all Qualified Bids.

c) Identification of the "Initial Bid" as determined pursuant to Paragraph 6(b), below.

The Debtor may disregard any Bids received after the Bid Deadline and any such Bids shall be deemed not to be Qualified Bids. If the Debtor has not received any Qualified Bids prior to the Bid Deadlines other than Buyer's Bid, the Buyer shall be deemed the Successful Bidder, no

7

Auction shall be conducted and the Debtor shall promptly seek confirmation of the Purchase, pursuant to the Purchase Agreement.

**6. The Auction**

*(a) Attendance at and Participation in the Auction.*

In addition to the Debtor and its advisors, the only parties (and their advisors) eligible to participate in the Auction shall be: (i) the Buyer and its representatives and advisors, (ii) the Committee and its representatives and advisors, and (iii) those Qualified Bidders who have submitted a Qualified Bid to the Debtor and their advisors.

*(b) The Auction Process.*

     (i) The Debtor Shall Conduct the Auction.

The Debtor and its professionals shall direct and preside over the Auction. At the commencement of the Auction the Debtor shall announce and describe the terms of the highest Qualified Bid. Bidding shall commence with the highest Qualified Bid ("Initial Bid"), as determined by the Debtor, in its reasonable business judgment, after consultation with its advisors. The foregoing determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate, including, inter alia, the following: (A) the amount and nature of the consideration; (B) the proposed assumption of any liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed closing date; the likelihood, extent and impact of any potential delays in closing; (E) any purchase price adjustments; and (F) the net economic effect of any changes from the Buyer's transaction documents, if any, contemplated by the Purchase Agreement relating to the Initial Bid ("Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully

8

disclosed to all other Qualified Bidders.  The Debtor shall maintain a transcript of all Bids made and announced at the Auction, including the Buyer's Bid, all Overbids and the Successful Bid.

      (ii)    Terms of Overbids.

An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Initial Bid.  To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

      (A)    <u>Minimum Overbid Increment</u>.

Any Overbid after the Initial Bid shall be made in increments of at least $100,000.

      (B)    <u>Remaining Terms are the Same as for Qualified Bids</u>.

Except as modified below, an Overbid must comply with the conditions for a Qualified Bid set forth above.  Any Overbid must remain open and binding on the Bidder until and unless the Debtor accepts a higher Qualified Bid as an Overbid.

To the extent not previously provided (which shall be determined by the Debtor), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor in their discretion) demonstrating such Qualified Bidder's ability to close the proposed Purchase pursuant to the terms of such Overbid.

      (iii)    Announcing Overbids.

The Debtor shall announce at the Auction the material terms of each Overbid, the basis for the calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtor's estate based on, <u>inter alia</u>, the Bid Assessment Criteria.

9

(iv)     Consideration of Overbids.

The Debtor reserves the right, in its reasonable business judgment, to make one or more adjournments in the Auction to, among other things:  facilitate discussions between the Debtor, on the one hand, and individual Bidders, on the other hand; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor in its reasonable business judgment may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Purchase at the prevailing Overbid amount;

(v)     Closing Auction.

The Auction shall continue until there is only one Qualified Bid that the Debtor determines in its reasonable business judgment, after consultation with its advisors,  is the highest and best Qualified Bid.  The Auction shall not close unless the Successful Bidder has submitted a fully executed Purchase Agreement memorializing the terms of the Successful Bid.

(vi)     Additional Procedures.

The Debtor may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g. the amount of time to make subsequent overbids) for conducting the Auction so long as such rules are not inconsistent with these Bid Procedures.

(vii)     Consent to Jurisdiction as Condition to Bidding.

All Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the sale of the Property and the construction and enforcement of the Purchase Agreement.

10

7. **Identification of the Successful Bidder and Acceptance of Successful Bid**

   (a) *Identification of the Successful Bidder.*

   At the close of the Auction, the Debtor shall identify the "Successful Bidder" which will be determined by considering the Bid Assessment Criteria.

   After announcing the Successful Bidder, the Debtor shall declare the Auction closed. Once the Auction is closed, the Debtor shall be prohibited from discussing, soliciting or accepting any Bids for the Property other than the Successful Bid.

8. **Confirmation of Sale**

   The Debtor will use its best efforts to obtain the Court's approval of the sale of the Property to the Successful Bidder pursuant to the form of the Purchase Agreement agreed to by the Debtor and the Successful Bidder. The hearing on Confirmation of Sale to the Successful Bidder shall be held on August 17, 2015, at 2:00 p.m., at the United States Bankruptcy Court for the District of Hawaii, 1132 Bishop Street, Suite 350L, Honolulu, Hawaii 96813.

9. **Breakup Fee**

   The Debtor and the Buyer agree and fully intend to negotiate and finalize a Purchase Agreement providing for a Purchase on the terms set forth in, and consistent with the LOI. The Buyer shall become eligible to receive the Breakup Fee, which shall be payable according to the terms of these Bid Procedures, upon the occurrence of one or more of the following, each a "Breakup Fee Eligibility Event": (a) the Debtor and the Buyer shall have (i) negotiated and executed the Purchase Agreement; (ii) Buyer confirms that it has completed all due diligence; (iii) Buyer reaffirms its Bid equal to the Purchase Price set forth in the Purchase Agreement; and (iv) Buyer has committed to proceed with the Purchase or its inability to do so is the direct result of the actions of the Debtor.

11

Subject to the occurrence of a Breakup Fee Eligibility Event, the Breakup Fee shall be payable to Buyer if (a) Buyer has not previously defaulted under the terms of the Purchase Agreement, and (b) any party other than the Buyer effectuates any transaction, sale, merger, recapitalization, plan of reorganization or any other disposition of any material portion of the Property, including the consummation of any plan of reorganization whereby existing secured and/or unsecured creditors convert their claims into equity. The Breakup Fee shall be paid in cash directly to Buyer from escrow at the time of the Closing of the Purchase, and the Breakup Fee shall be deemed to be a superpriority administrative expense under section 503 of the Bankruptcy Code, with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (a "Super-Priority Claim"). If the Buyer is not the Successful Bidder, the Successful Bidder's cash deposit, required under paragraph 4(a)(iv) above, shall not be released or applied until the Breakup Fee has been paid in full. If the Purchase is effectuated through a Plan, including any plan of reorganization whereby existing secured and/or unsecured creditors convert their claims into equity, the Breakup Fee shall be paid in cash on the effective date of such Plan.

**10.     No Modification of Bid Procedures**

The Bid Procedures may not be modified except with the express written consent of the Buyer and the Debtor.

**[Remainder of this page left intentionally blank]**

12

## PRELIMINARY REPORT
(No Liability Hereunder)

This report (and any revisions thereto) is issued solely for the convenience of the titleholder, the titleholder's agent, counsel, purchaser or mortgagee, or the person ordering it for the purpose of facilitating the issuance of a policy of title insurance by Title Guaranty of Hawaii and no liability will arise under this report.

------------------------------------------------

## SCHEDULE A

Title Guaranty of Hawaii, Incorporated, hereby reports that, subject to those matters set forth in Schedule "B" hereof, the title to the estate or interest to the land described in Schedule "C" hereof is vested in:


POMARE, LTD.,
a Hawaii corporation,
as Lessee


This report is dated as of July 15, 2014 at 8:00 a.m.


Inquiries concerning this report
should be directed to
LISA NAGATA.
Email lnagata@tghawaii.com
Fax (808) 521-0287
Telephone (808) 533-5821.
Refer to Order No. 201431032.


# EXHIBIT A

© Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

## SCHEDULE B
## EXCEPTIONS

1.  Real Property Taxes, if any, that may be due and owing.

    Tax Key:  (1) 1-5-013-018   Area assessed:  60,679 sq. ft.
                                - covers Parcel First, Lot C

    Tax Key:  (1) 1-5-013-003   Area assessed:  4,948 sq. ft.
                                - covers Parcel Second, Lot 30-B-1 &
                                Parcel Third, Lot D-1

    Tax Key:  (1) 1-5-013-004   Area assessed:  16,614 sq. ft.
                                - covers Parcel Second, Lot 30-B-2 &
                                Parcel Third, Lot D-2

2.  Mineral and water rights of any nature in favor of the State of
    Hawaii.

3.  -AS TO PARCEL FIRST:-

    (A)  NOTICE OF PENDENCY OF ACTION, L. No. 18604, in favor of the
         STATE OF HAWAII, to acquire title to portions of Lot C,
         dated October 23, 1947, filed as Land Court Document No.
         96035.

    (B)  NOTICE OF PENDENCY OF ACTION, L. No. 20196, in favor of the
         STATE OF HAWAII, to acquire abutter's rights of vehicle
         access appurtenant to Lot C, dated September 2, 1949, filed
         as Land Court Document No. 112472.

    -Note:-    Final Order of Condemnation, filed March 16, 1953, in
               favor of the Territory of Hawaii (now State of
               Hawaii).  (Not noted on Transfer Certificate of Title
               No. 145,205)

    (C)  Restriction of access rights, as shown on Map 16, as set
         forth by Land Court Order No. 11868, filed March 19, 1953.

Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII  96913, PH: (808) 533-6261
Page 2

SCHEDULE B CONTINUED

(D)   Easement "14" for water pipeline purposes, as shown on Map
      32, as set forth by Land Court Order No. 66634, filed July
      25, 1983.

(E)   GRANT to CITY AND COUNTY OF HONOLULU, dated November 4,
      1983, filed as Land Court Document No. 1206066; a right and
      easement over said Easement "14".

4.   -AS TO PARCEL SECOND:-

(A)   Easement "18" (10 feet wide) for pipeline purposes in favor
      of Honolulu Gas Company, Limited, over and across Lot 30-B-
      2, as shown on Map 2 of Land Court Application No. 1758.

(B)   Easement "19" over and across Lot 30-B-2, as shown on Map 2
      of Land Court Application No. 1758.

(C)   Easement "20" over and across Lot 30-B-1, as shown on Map 2
      of Land Court Application No. 1758.

(D)   Easement "21" (10 feet wide) for oil pipeline purposes in
      favor of Standard Oil Company of California, situate over
      and across Lot 30-B-1, as shown on Map 2 of Land Court
      Application No. 1758.

(E)   Restriction of access rights in favor of the State of
      Hawaii, pursuant to two Final Orders of Condemnation, Law
      No. 20196, the first being recorded in the Bureau of
      Conveyances of the State of Hawaii in Liber 2412 at Page
      93, and the second being unrecorded, the portions affected
      thereby being shown on said Map 2.

Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

SCHEDULE B CONTINUED

(F)   Possible future restriction of access rights as set forth
      in the Petition and Lis Pendens of Law 21290, Territory of
      Hawaii (now State of Hawaii) vs. Inter-Island Steam
      Navigation Company, Limited, the portions affected thereby
      being shown on said Map 2; nothing herein to be deemed to
      restrict access or to affect the rights of the Oahu Railway
      and Land Company to compensation for such restriction, such
      portion being shown on said Map 2 solely for future
      convenience in description.


5.   -AS TO PARCEL THIRD:-

(A)   The terms and provisions contained in the that certain pipe
      line license or agreement with the UNION OIL COMPANY OF
      CALIFORNIA, by AGREEMENT dated January 25, 1923, subject to
      termination as therein provided.

(B)   NOTICE OF PENDENCY OF ACTION, L. No. 18604, in favor of the
      STATE OF HAWAII to acquire title to portions of Lot C,
      dated October 23, 1947, filed as Land Court Document No.
      96035.


6.   The terms and provisions contained in Lease referred to in
     Schedule C.

     The foregoing includes, but is not limited to the matter relating
     to consent by the Lessor for any assignment or subletting.


7.   Any facts, rights, interests or claims which are not shown by the
     public records, but which could be ascertained by making inquiry
     of the lessors in the lease or leases described or referred to in
     Schedule C.

SCHEDULE B CONTINUED

8. Discrepancies, conflicts in boundary lines, shortage in area,
   encroachments or any other matters which a correct survey or
   archaeological study would disclose.

9. Any unrecorded leases and matters arising from or affecting the
   same.

**END OF SCHEDULE B**

© Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

## SCHEDULE C

UNRECORDED LEASE

LESSOR      :   HONOLULU LIMITED, a Hawaii corporation

LESSEE      :   JAMES STEWART ROMIG, unmarried

DATED       :   August 24, 1982
TERM        :   approximately 56 years commencing on August 24,
                1982 and terminating 55 years and 90 days after
                the issuance of a final certificate of occupancy
                or the equivalent for the improvements to be
                constructed on the premises by the Lessor

A Short Form Lease is dated August 24, 1982, filed as Land Court
Document No. 1134417.


THE LESSEE'S INTEREST BY MESNE ASSIGNMENTS ASSIGNED

ASSIGNOR    :   JAMES S. ROMIG, as Trustee of the James S. Romig
                Revocable Living Trust dated August 15, 1980

ASSIGNEE    :   POMARE, LTD., a Hawaii corporation

DATED       :   July 11, 2003
FILED       :   Land Court Document No. 3051053

CONSENT     :   Given by HONOLULU LIMITED, a Maryland corporation,
                by instrument dated November 26, 2003, filed as
                Land Court Document No. 3051054, and by 3900
                CORP., a Maryland corporation, by instrument dated
                November 26, 2003, filed as Land Court Document
                No. 3051055.


Said Lease demising the following described premises:

All of those certain parcels of land situate at Kaholaloa, Honolulu,
City and County of Honolulu, State of Hawaii, described as follows:

© Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

SCHEDULE C CONTINUED

-PARCEL FIRST:-

LOT C, area 1.393 acres, more or less, as shown on Map 1, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1056 of Oahu Railway and Land Company.

Together with right of way over all roads now existing on Lot A-1 as shown on Map 5; Lot(s) A-2-A, A-2-B, A-3-B, A-3-C and A-3-D, as shown on Map 12; Lot 10 as shown on Map 27; Lot F-2 as shown on Map 11; and Lot 6 as shown on Map 26; all being a portion of said application, as reserved in Land Court Document No. 282601.

Being land(s) described in Transfer Certificate of Title No. 145,205 issued to Honolulu Limited, a Hawaii corporation.


-PARCEL SECOND:-

          LOTS:  30-B-1, area  2,808 square feet, and
                 30-B-2, area 11,474 square feet, more or less, as shown on Map 9, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1758 (amended) of Oahu Railway and Land Company.

Being land(s) described in Transfer Certificate of Title No. 217,231 issued to Honolulu Limited, a Hawaii corporation.


-PARCEL THIRD:-

          LOTS:  D-1, area 2,140 square feet, and
                 D-2, area 5,140 square feet, more or less, as shown on Map 31, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1056 of Oahu Railway and Land Company;

Being land(s) described in Transfer Certificate of Title No. 270,030 issued to Honolulu Limited, a Hawaii corporation.


# END OF SCHEDULE C

# GENERAL NOTES

1.  There is hereby omitted from any covenants, conditions and
    reservations contained herein any covenant or restriction based
    on race, color, religion, sex, sexual orientation, familial
    status, marital status, disability, handicap, national origin,
    ancestry, or source of income, as set forth in applicable state
    or federal laws, except to the extent that said covenant or
    restriction is permitted by applicable law.  Lawful restrictions
    under state or federal law on the age of occupants in senior
    housing or housing for older persons shall not be construed as
    restrictions based on familial status.

2.  CERTIFICATE OF MERGER dated January 2, 1998, recorded as Document
    No. 98-082916 sets forth the following filed with the Department
    of Commerce and Consumer Affairs, effective on December 31, 1997:

    (A)  That HONOLULU LIMITED, a Hawaii corporation, was merged with
         and into HJW/HONOLULU, INC., a Maryland corporation, and
         surviving corporation is HJW/HONOLULU, INC.; and

    (B)  The name change of HJW/HONOLULU, INC. has changed it's name
         to HONOLULU LIMITED, a Maryland corporation.

    (A Land Court Petition may be required because the above is not
    noted on Transfer Certificate(s) of Title referred to herein)

© **Title Guaranty of Hawaii, Inc.**
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

# GUIDELINES FOR THE ISSUANCE OF INSURANCE

A. Taxes shown in Schedule B are as of the date such information is available from the taxing authority. Evidence of payment of all taxes and assessments subsequent to such date must be provided prior to recordation.

B. Evidence of authority regarding the execution of all documents pertaining to the transaction is required prior to recordation. This includes corporate resolutions, copies of partnership agreements, powers of attorney and trust instruments.

C. If an entity (corporation, partnership, limited liability company, etc.) is not registered in Hawaii, evidence of its formation and existence under the laws where such entity is formed must be presented prior to recordation.

D. If the transaction involves a construction loan, the following is required:

    (1) a letter confirming that there is no construction prior to recordation; or

    (2) if there is such construction, appropriate indemnity agreements, financial statements and other relevant information from the owner, developer, general contractor and major sub-contractors must be submitted to the Title Company for approval at least one week prior to the anticipated date of recordation.

    Forms are available upon request from Title Guaranty of Hawaii.

E. Chapter 669, Hawaii Revised Statutes, sets forth acceptable tolerances for discrepancies in structures or improvements relative to private property boundaries for various classes of real property. If your survey map shows a position discrepancy that falls within the tolerances of Chapter 669, call your title officer as affirmative coverage may be available to insured lenders.

F. The right is reserved to make additional exceptions and/or requirements upon examination of all documents submitted in connection with this transaction.

G. If a policy of title insurance is issued, it will exclude from coverage all matters set forth in Schedule B of this report and in the printed Exclusions from Coverage contained in an ALTA policy or in the Hawaii Standard Owner's Policy, as applicable. Different forms may have different exclusions and should be reviewed. Copies of the policy forms are available upon request from Title Guaranty of Hawaii or on our website at www.tghawaii.com.

U.S. Bankruptcy Court - Hawaii #14-00205 Dkt # 215 Filed 06/01/15 Page 59 of 87

DATE PRINTED: 3/26/2015

STATEMENT OF ASSESSED VALUES AND REAL PROPERTY TAXES DUE

TAX MAP KEY

DIVISION ZONE SECTION PLAT PARCEL HPR NO.
(1)      1      5       013  018   0000

CLASS: INDUSTRIAL                    AREA ASSESSED:     60,679 SF

ASSESSED VALUES FOR CURRENT YEAR TAXES: 2014

The records of this division show the assessed values and taxes on
the property designated by Tax Key shown above are as follows:

```
BUILDING         $            0
EXEMPTION        $            0
NET VALUE        $            0
LAND             $    4,702,400
EXEMPTION        $            0
NET VALUE        $    4,702,400
TOTAL NET VALUE  $    4,702,400
```

Installment  (1 - due 8/20;  2 - due 2/20)     Tax Info As Of -  8/20/2014

| Tax Year | Installment | Tax Amount | Penalty Amount | Interest Amount | Other Amount | Total Amount | |
|---|---|---|---|---|---|---|---|
| 2014 | 2 | 29,154.88 | | | | 29,154.88 | PENDING |
| 2014 | 1 | 29,154.88 | 1,749.30 | 618.08 | | 31,522.26 | DELINQUENT |
| 2013 | 2 | 28,262.70 | 2,826.27 | 2,487.12 | | 33,576.09 | DELINQUENT |
| 2013 | 1 | 28,262.70 | 2,826.27 | 4,352.46 | | 35,441.43 | DELINQUENT |

                                   Total Amount Due:    129,694.66

Penalty and Interest Computed to:  8/20/2014

DATE PRINTED: 3/26/2015

STATEMENT OF ASSESSED VALUES AND REAL PROPERTY TAXES DUE

TAX MAP KEY

DIVISION ZONE SECTION PLAT PARCEL HPR NO.
(1)      1      5      013   003    0000

CLASS: INDUSTRIAL                    AREA ASSESSED:      4,948 SF

ASSESSED VALUES FOR CURRENT YEAR TAXES: 2014

The records of this division show the assessed values and taxes on
the property designated by Tax Key shown above are as follows:

```
                    BUILDING        $  8,391,200
                    EXEMPTION       $          0
                    NET VALUE       $  8,391,200
                    LAND            $    339,400
                    EXEMPTION       $          0
                    NET VALUE       $    339,400
                    TOTAL NET VALUE $  8,730,600
```

Installment  (1 - due 8/20;  2 - due 2/20)      Tax Info As Of -   8/20/2014

| Tax Year | Installment | Tax Amount | Penalty Amount | Interest Amount | Other Amount | Total Amount | |
|---|---|---|---|---|---|---|---|
| 2014 | 2 | 54,129.72 | | | | 54,129.72 | PENDING |
| 2014 | 1 | 54,129.72 | 3,247.78 | 1,147.55 | | 58,525.05 | DELINQUENT |
| 2013 | 2 | 53,962.94 | 5,396.30 | 4,748.74 | | 64,107.98 | DELINQUENT |
| 2013 | 1 | 53,962.94 | 5,396.30 | 8,310.29 | | 67,669.53 | DELINQUENT |

                                   Total Amount Due:    244,432.28

Penalty and Interest Computed to:  8/20/2014

201431032                   © Title Guaranty of Hawaii, Inc.
                     235 QUEEN ST., HONOLULU, HAWAII 96813, PH. (808) 533-6261

DATE PRINTED: 3/26/2015

STATEMENT OF ASSESSED VALUES AND REAL PROPERTY TAXES DUE

TAX MAP KEY

DIVISION ZONE SECTION PLAT PARCEL HPR NO.
(1)      1      5      013   004    0000

CLASS: INDUSTRIAL                    AREA ASSESSED:      16,614 SF

ASSESSED VALUES FOR CURRENT YEAR TAXES:  2014

The records of this division show the assessed values and taxes on
the property designated by Tax Key shown above are as follows:

```
            BUILDING         $            0
            EXEMPTION        $            0
            NET VALUE        $            0
            LAND             $    1,139,700
            EXEMPTION        $            0
            NET VALUE        $    1,139,700
            TOTAL NET VALUE  $    1,139,700
```

Installment  (1 - due 8/20;  2 - due 2/20)     Tax Info As Of -  8/20/2014

| Tax Year | Installment | Tax Amount | Penalty Amount | Interest Amount | Other Amount | Total Amount | |
|---|---|---|---|---|---|---|---|
| 2014 | 2 | 7,066.14 | | | | 7,066.14 | PENDING |
| 2014 | 1 | 7,066.14 | 423.97 | 149.80 | | 7,639.91 | DELINQUENT |
| 2013 | 2 | 6,849.76 | 684.98 | 602.78 | | 8,137.52 | DELINQUENT |
| 2013 | 1 | 6,849.76 | 684.98 | 1,054.86 | | 8,589.60 | DELINQUENT |

                              Total Amount Due:   31,433.17

Penalty and Interest Computed to:  8/20/2014

© Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

U.S. Bankruptcy Court - Hawaii #15-00203 Dkt # 215 Filed 06/01/15 Page 62 of 87

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

In re

POMARE, LTD., dba
HILO HATTIE

       Debtor and
       Debtor-in-Possession.

74314v5

BK. NO. 15-00203
(Chapter 11)

## BID PROCEDURES

As contemplated by and incorporated in that certain bid procedures order (the "Bid Procedures Order"), the following procedures ("Bid Procedures") shall be the exclusive mechanism governing any disposition of the Property in any form or structure to the Successful Bidder on the terms and conditions of the Successful Bid and the associated Purchase Documents.

1.    **Certain Defined Terms:**

    (a)    "Purchase" means the transfer of the Property to the Successful Bidder pursuant to the Purchase Agreement, as amended by the Successful Bidder, if other than the Buyer.

    (b)    "Purchase Agreement" means that certain agreement between the Debtor and the Buyer pursuant to which the Buyer has offered to acquire the Property.

    (c)    "Purchase Documents" means the Purchase Agreement and any other document deemed necessary or appropriate to effectuate the Purchase.

    (d)    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Hawaii.

(e) "Breakup Fee" means $250,000, payable in cash pursuant to these Bid Procedures and the Bid Procedures Order.

(f) "Buyer" means a special purpose entity to be created by Adobe/Avery Parkway, LLC ("Adobe") and co-investors selected by Adobe.

(g) "Buyer's Bid" means Buyer's offer in the amount of $4,800,000, as set forth in the Purchase Agreement.

(h) "Committee" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

(i) "Debtor" means Pomare, Ltd., dba Hilo Hattie.

(j) "Initial Minimum Overbid" means the first Qualified Bid after Buyer's Bid that at a minimum must be $5,100,000, in cash, or such other offer that the Debtor determines to be the economic equivalent of a $5,100,000 cash bid.

(k) "LOI" means that certain Letter of Intent ("LOI") dated March 25, 2015, executed by the Debtor and the Buyer, and filed with the Bankruptcy Court.

(l) "Property" means that certain leasehold parcel of real property located at 700 North Nimitz Highway, Honolulu, Hawaii 96817, as more particularly described in Exhibit A, attached hereto and incorporated by reference.

## 2.  Determining Potential Bidders

To participate in the bidding process and to receive non-public information concerning the Property, each person or entity other than the Buyer ("Potential Bidder") must deliver to the Debtor and the Buyer the following materials ("Potential Bid Package"):

(a)  *Non-Binding Indication of Interest.*

An executed non-binding indication of interest at a price at least equal to the Initial Minimum Overbid.

(b)  *Confidentiality Agreement.*

An executed confidentiality agreement in a form reasonably acceptable to the Debtor.  It is contemplated that the form of confidentiality agreement proposed by the Debtor shall be substantially similar for all Potential Bidders.

2

*(c)*     *Identification of Bidder.*

Each Potential Bid Package shall identify the Potential Bidder and the Bidder's Sponsors (if any), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

*(d)*     *Corporate Authority.*

Each Potential Bid Package shall contain written evidence of the Potential Bidder's Board of Directors' (or comparable governing body) approval of the proposed Purchase; *provided*, *however*, that, if the Potential Bidder is an entity specially formed for the purpose of acquiring the Property, then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the contemplated transactions by the Board of Directors (or comparable governing body) of each of the equity holder(s) of the Potential Bidder ("Bidder's Sponsors").

*(e)*     *Proof of Financial Ability to Perform.*

Each Potential Bidder must provide evidence that the Debtor reasonably concludes demonstrates the Potential Bidder has the necessary financial ability to close the Purchase. Such information should include, <u>inter</u> <u>alia</u>, the following:

(i)     contact names and numbers for verification of financing sources,

(ii)    evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Purchase, which commitments shall not be contingent or conditional; and

(iii)   Any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor, demonstrating that such Potential Bidder has the ability to close the Purchase;

3

The Debtor shall determine, in its reasonable discretion, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications.

**3.      Determination of Potential Bidders; Notification**

(a)      *Determination of Potential Bidders.*

Within five (5) business day after the submission of a Potential Bid Package, the Debtor shall determine whether that party qualifies as a Potential Bidder.  The Debtor shall have the discretion to determine whether a party may be a Potential Bidder based upon the content of the Potential Bid Package, as well as commercial and competitive considerations.

(b)      *Notification of Potential Bidders.*

Upon determining that a party is a Potential Bidder, the Debtor shall immediately thereafter notify the Buyer, the Committee, and each Potential Bidder in writing. Contemporaneous with notifying a party that it is a Potential Bidder, the Debtor shall provide that Potential Bidder with access to the same confidential, evaluation materials and information provided by the Debtor to the Buyer and each other Potential Bidder, which shall include financial information and other data related to the Property and/or such other information as the Potential Bidder may reasonably request.  If the Debtor furnishes any information related to the Debtor not heretofore given to the Buyer, then the Debtor shall make such information available to the Buyer and each Potential Bidder.

4

4.  **Determining Qualified Bids and Qualified Bidders**

    (a)   *Terms and Conditions of a Qualified Bid.*

    Each offer, solicitation or proposal ("Bid") from a Potential Bidder must satisfy each of the following conditions to be deemed a "Qualified Bid" and for the Potential Bidder to be deemed a "Qualified Bidder":

    (i)   Nature of Bids.

    A Bid shall include a copy of the Purchase Agreement marked to show all changes requested by the Potential Bidder (including those related to purchase price), shall not be subject to any financing or due diligence contingencies, and must remain open and binding on the Potential Bidder until and unless the Auction, as defined below, concludes or the Debtor receives and accepts a higher Bid at the Auction. The Debtor may conclude, in its reasonable business judgment, that any changes to the Purchase Agreement are detrimental to unsecured creditors or the estate and based on such determination decline to designate a Potential Bidder as a Qualified Bidder. In addition, the Potential Bidder must deliver a fully executed copy of the Potential Bidder's proposed Purchase Agreement, including any increased bid at the Auction, which Purchase Agreement shall be binding on the Potential Bidder if its Bid is accepted as the best Bid by the Debtor at the Auction.

    (ii)   Initial Minimum Overbid.

    The consideration proposed by the Initial Minimum Overbid, if any, shall be cash or cash equivalents that equal or exceed the sum of $5,100,000.

    (iii)   No Bid Protections for Potential Bidders.

    A Bid may not request any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, neither the tendering of a Bid nor the determination that a

5

Bid is a Qualified Bid shall entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

      (iii)    Bid Deadline.

Regardless of when a party qualifies as a Potential Bidder, the Debtor must receive a Bid in writing, on or before the "Bid Deadline," which shall be July 27, 2015, at 4:00 p.m., Hawaii Standard Time. The Bid shall be delivered to Seller's counsel, Wagner Choi & Verbrugge, 745 Fort Street, Suite 1900, Honolulu, Hawaii 96813.

      (iv)    Cash Deposit.

Each Bid, other than Buyer's bid, must be accompanied by a $250,000 USD cash deposit payable to a non-interest bearing escrow account to be identified and established by the Debtor. The deposit of the Successful Bidder shall be increased to 10% of the consideration included in the Successful Bid within three (3) business days after the Successful Bid is approved by the Bankruptcy Court.

      (v)    Refund of Deposits

In the event any Potential Bidder is determined by the Debtor not to be a Qualified Bidder, the Potential Bidder shall be refunded its deposit and all accumulated interest thereon, if any, within three (3) business days after that determination. Each Qualified Bidder, including Buyer, other than the Successful Bidder shall be refunded its deposit and all accumulated interest thereon, if any, within three (3) business days after the selection of the Successful Bid.

      *(b)*    *Qualified Bidders.*

Pursuant to the terms and conditions set forth in this § 4(b), the Debtor shall identify and notify all bidders whether they are Qualified Bidders by July 30, 2015. Any party may seek the Court's review of the Debtor's determination whether a Potential Bidder is a Qualified Bidder;

U.S. Bankruptcy Court - Hawaii  #15-00203  Dkt # 215  Filed 06/01/15  Page 69 of 87

*provided*, *however*, that any such challenge must be raised and concluded prior to the commencement of the Auction. The Debtor's determination of the Qualified Bidders shall become irrevocable and unreviewable once the Auction has commenced.

(i)      Buyer.

Notwithstanding anything in these Bid Procedures to the contrary, the Buyer is deemed a Qualified Bidder, and the Buyer's Bid set forth in the Purchase Agreement shall be deemed a Qualified Bid, for all applicable purposes under these Bid Procedures.

(ii)     Other Qualified Bidders.

Each Bid received from a Potential Bidder that satisfies each of the conditions set forth herein shall constitute a "Qualified Bid" and the bidder shall be deemed a "Qualified Bidder."

## 5. Notice of the Auction or of Absence of Qualified Bids

If the Debtor receives a Qualified Bid other than the Buyer's Bid, an auction ("Auction") will be held on August 7, 2015, at the offices of Seller's counsel, Wagner Choi & Verbrugge, 745 Fort Street, Suite 1900, Honolulu, Hawaii 96813, or at any such other location as the Debtor may hereafter designate. On or prior to 5:00 p.m., Hawaii Standard Time, August 4, 2015, the Debtor shall provide to Buyer and each Qualified Bidder that has submitted a Qualified Bid:

a)   Written notice of the Auction; and

b)   Copies of all Qualified Bids.

c)   Identification of the "Initial Bid" as determined pursuant to Paragraph 6(b), below.

The Debtor may disregard any Bids received after the Bid Deadline and any such Bids shall be deemed not to be Qualified Bids. If the Debtor has not received any Qualified Bids prior to the Bid Deadlines other than Buyer's Bid, the Buyer shall be deemed the Successful Bidder, no

7

Auction shall be conducted and the Debtor shall promptly seek confirmation of the Purchase, pursuant to the Purchase Agreement.

**6.     The Auction**

   *(a)      Attendance at and Participation in the Auction.*

In addition to the Debtor and its advisors, the only parties (and their advisors) eligible to participate in the Auction shall be: (i) the Buyer and its representatives and advisors, (ii) the Committee and its representatives and advisors, and (iii) those Qualified Bidders who have submitted a Qualified Bid to the Debtor and their advisors.

   *(b)      The Auction Process.*

      (i)      The Debtor Shall Conduct the Auction.

The Debtor and its professionals shall direct and preside over the Auction.  At the commencement of the Auction the Debtor shall announce and describe the terms of the highest Qualified Bid.  Bidding shall commence with the highest Qualified Bid ("Initial Bid"), as determined by the Debtor, in its reasonable business judgment, after consultation with its advisors.  The foregoing determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate, including, inter alia, the following: (A) the amount and nature of the consideration; (B) the proposed assumption of any liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed closing date; the likelihood, extent and impact of any potential delays in closing; (E) any purchase price adjustments; and (F) the net economic effect of any changes from the Buyer's transaction documents, if any, contemplated by the Purchase Agreement relating to the Initial Bid ("Bid Assessment Criteria").  All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully

8

disclosed to all other Qualified Bidders. The Debtor shall maintain a transcript of all Bids made and announced at the Auction, including the Buyer's Bid, all Overbids and the Successful Bid.

      (ii)    Terms of Overbids.

An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Initial Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

      (A)    <u>Minimum Overbid Increment.</u>

Any Overbid after the Initial Bid shall be made in increments of at least $100,000.

      (B)    <u>Remaining Terms are the Same as for Qualified Bids.</u>

Except as modified below, an Overbid must comply with the conditions for a Qualified Bid set forth above. Any Overbid must remain open and binding on the Bidder until and unless the Debtor accepts a higher Qualified Bid as an Overbid.

To the extent not previously provided (which shall be determined by the Debtor), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor in their discretion) demonstrating such Qualified Bidder's ability to close the proposed Purchase pursuant to the terms of such Overbid.

      (iii)    Announcing Overbids.

The Debtor shall announce at the Auction the material terms of each Overbid, the basis for the calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtor's estate based on, <u>inter alia</u>, the Bid Assessment Criteria.

9

(iv)  Consideration of Overbids.

The Debtor reserves the right, in its reasonable business judgment, to make one or more adjournments in the Auction to, among other things:  facilitate discussions between the Debtor, on the one hand, and individual Bidders, on the other hand; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor in its reasonable business judgment may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Purchase at the prevailing Overbid amount;

(v)  Closing Auction.

The Auction shall continue until there is only one Qualified Bid that the Debtor determines in its reasonable business judgment, after consultation with its advisors,  is the highest and best Qualified Bid.  The Auction shall not close unless the Successful Bidder has submitted a fully executed Purchase Agreement memorializing the terms of the Successful Bid.

(vi)  Additional Procedures.

The Debtor may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g. the amount of time to make subsequent overbids) for conducting the Auction so long as such rules are not inconsistent with these Bid Procedures.

(vii)  Consent to Jurisdiction as Condition to Bidding.

All Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the sale of the Property and the construction and enforcement of the Purchase Agreement.

10

7. **Identification of the Successful Bidder and Acceptance of Successful Bid**

    (a)   *Identification of the Successful Bidder.*

At the close of the Auction, the Debtor shall identify the "Successful Bidder" which will be determined by considering the Bid Assessment Criteria.

After announcing the Successful Bidder, the Debtor shall declare the Auction closed. Once the Auction is closed, the Debtor shall be prohibited from discussing, soliciting or accepting any Bids for the Property other than the Successful Bid.

8. **Confirmation of Sale**

The Debtor will use its best efforts to obtain the Court's approval of the sale of the Property to the Successful Bidder pursuant to the form of the Purchase Agreement agreed to by the Debtor and the Successful Bidder. The hearing on Confirmation of Sale to the Successful Bidder shall be held on August 17, 2015, at 2:00 p.m., at the United States Bankruptcy Court for the District of Hawaii, 1132 Bishop Street, Suite 350L, Honolulu, Hawaii 96813.

9. **Breakup Fee**

The Debtor and the Buyer agree and fully intend to negotiate and finalize a Purchase Agreement providing for a Purchase on the terms set forth in, and consistent with the LOI. The Buyer shall become eligible to receive the Breakup Fee, which shall be payable according to the terms of these Bid Procedures, upon the occurrence of one or more of the following, each a "Breakup Fee Eligibility Event": (a) the Debtor and the Buyer shall have (i) negotiated and executed the Purchase Agreement; (ii) Buyer confirms that it has completed all due diligence; (iii) Buyer reaffirms its Bid equal to the Purchase Price set forth in the Purchase Agreement; and (iv) Buyer has committed to proceed with the Purchase or its inability to do so is the direct result of the actions of the Debtor.

11

Subject to the occurrence of a Breakup Fee Eligibility Event, the Breakup Fee shall be payable to Buyer if (a) Buyer has not previously defaulted under the terms of the Purchase Agreement, and (b) any party other than the Buyer effectuates any transaction, sale, merger, recapitalization, plan of reorganization or any other disposition of any material portion of the Property, including the consummation of any plan of reorganization whereby existing secured and/or unsecured creditors convert their claims into equity. The Breakup Fee shall be paid in cash directly to Buyer from escrow at the time of the Closing of the Purchase, and the Breakup Fee shall be deemed to be a superpriority administrative expense under section 503 of the Bankruptcy Code, with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (a "Super-Priority Claim"). If the Buyer is not the Successful Bidder, the Successful Bidder's cash deposit, required under paragraph 4(a)(iv) above, shall not be released or applied until the Breakup Fee has been paid in full. If the Purchase is effectuated through a Plan, including any plan of reorganization whereby existing secured and/or unsecured creditors convert their claims into equity, the Breakup Fee shall be paid in cash on the effective date of such Plan.

**10. No Modification of Bid Procedures**

The Bid Procedures may not be modified except with the express written consent of the Buyer and the Debtor.

**[Remainder of this page left intentionally blank]**

12

## PRELIMINARY REPORT
(No Liability Hereunder)

This report (and any revisions thereto) is issued solely for the convenience of the titleholder, the titleholder's agent, counsel, purchaser or mortgagee, or the person ordering it for the purpose of facilitating the issuance of a policy of title insurance by Title Guaranty of Hawaii and no liability will arise under this report.

-----------------------------------------

## SCHEDULE A

Title Guaranty of Hawaii, Incorporated, hereby reports that, subject to those matters set forth in Schedule "B" hereof, the title to the estate or interest to the land described in Schedule "C" hereof is vested in:

POMARE, LTD.,
a Hawaii corporation,
as Lessee

This report is dated as of July 15, 2014 at 8:00 a.m.

Inquiries concerning this report
should be directed to
LISA NAGATA.
Email lnagata@tghawaii.com
Fax (808) 521-0287
Telephone (808) 533-5821.
Refer to Order No. 201431032.

# EXHIBIT A

© Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813,  PH: (808) 533-6261

## SCHEDULE B
## EXCEPTIONS

1.  Real Property Taxes, if any, that may be due and owing.

    Tax Key:  <u>(1) 1-5-013-018</u>   Area assessed:  60,679 sq. ft.
                              - covers Parcel First, Lot C

    Tax Key:  <u>(1) 1-5-013-003</u>   Area assessed:  4,948 sq. ft.
                              - covers Parcel Second, Lot 30-B-1 &
                                Parcel Third, Lot D-1

    Tax Key:  <u>(1) 1-5-013-004</u>   Area assessed:  16,614 sq. ft.
                              - covers Parcel Second, Lot 30-B-2 &
                                Parcel Third, Lot D-2


2.  Mineral and water rights of any nature in favor of the State of
    Hawaii.


3.  -AS TO PARCEL FIRST:-

    (A)  NOTICE OF PENDENCY OF ACTION, L. No. 18604, in favor of the
         STATE OF HAWAII, to acquire title to portions of Lot C,
         dated October 23, 1947, filed as Land Court Document No.
         <u>96035</u>.


    (B)  NOTICE OF PENDENCY OF ACTION, L. No. 20196, in favor of the
         STATE OF HAWAII, to acquire abutter's rights of vehicle
         access appurtenant to Lot C, dated September 2, 1949, filed
         as Land Court Document No. <u>112472</u>.

    -Note:-   Final Order of Condemnation, filed March 16, 1953, in
              favor of the Territory of Hawaii (now State of
              Hawaii).  (Not noted on Transfer Certificate of Title
              No. 145,205)


    (C)  Restriction of access rights, as shown on Map 16, as set
         forth by Land Court Order No. <u>11868</u>, filed March 19, 1953.

2014-310632 © Title Guaranty of Hawaii, Inc. Page 72
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

SCHEDULE B CONTINUED


(D)    Easement "14" for water pipeline purposes, as shown on Map
       32, as set forth by Land Court Order No. 66634, filed July
       25, 1983.


(E)    GRANT to CITY AND COUNTY OF HONOLULU, dated November 4,
       1983, filed as Land Court Document No. 1206066; a right and
       easement over said Easement "14".


4.    -AS TO PARCEL SECOND:-


(A)    Easement "18" (10 feet wide) for pipeline purposes in favor
       of Honolulu Gas Company, Limited, over and across Lot 30-B-
       2, as shown on Map 2 of Land Court Application No. 1758.


(B)    Easement "19" over and across Lot 30-B-2, as shown on Map 2
       of Land Court Application No. 1758.


(C)    Easement "20" over and across Lot 30-B-1, as shown on Map 2
       of Land Court Application No. 1758.


(D)    Easement "21" (10 feet wide) for oil pipeline purposes in
       favor of Standard Oil Company of California, situate over
       and across Lot 30-B-1, as shown on Map 2 of Land Court
       Application No. 1758.


(E)    Restriction of access rights in favor of the State of
       Hawaii, pursuant to two Final Orders of Condemnation, Law
       No. 20196, the first being recorded in the Bureau of
       Conveyances of the State of Hawaii in Liber 2412 at Page
       93, and the second being unrecorded, the portions affected
       thereby being shown on said Map 2.

Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

SCHEDULE B CONTINUED

    (F)  Possible future restriction of access rights as set forth in the Petition and Lis Pendens of Law 21290, Territory of Hawaii (now State of Hawaii) vs. Inter-Island Steam Navigation Company, Limited, the portions affected thereby being shown on said Map 2; nothing herein to be deemed to restrict access or to affect the rights of the Oahu Railway and Land Company to compensation for such restriction, such portion being shown on said Map 2 solely for future convenience in description.

5.   -AS TO PARCEL THIRD:-

    (A)  The terms and provisions contained in the that certain pipe line license or agreement with the UNION OIL COMPANY OF CALIFORNIA, by AGREEMENT dated January 25, 1923, subject to termination as therein provided.

    (B)  NOTICE OF PENDENCY OF ACTION, L. No. 18604, in favor of the STATE OF HAWAII to acquire title to portions of Lot C, dated October 23, 1947, filed as Land Court Document No. 96035.

6.   The terms and provisions contained in Lease referred to in Schedule C.

    The foregoing includes, but is not limited to the matter relating to consent by the Lessor for any assignment or subletting.

7.   Any facts, rights, interests or claims which are not shown by the public records, but which could be ascertained by making inquiry of the lessors in the lease or leases described or referred to in Schedule C.

© Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

SCHEDULE B CONTINUED

8.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments or any other matters which a correct survey or archaeological study would disclose.

9.  Any unrecorded leases and matters arising from or affecting the same.

**END OF SCHEDULE B**

© **Title Guaranty of Hawaii, Inc.**
235 QUEEN ST., HONOLULU, HAWAII 96813,  PH: (808) 533-6261

## SCHEDULE C


UNRECORDED LEASE

LESSOR      :  HONOLULU LIMITED, a Hawaii corporation

LESSEE      :  JAMES STEWART ROMIG, unmarried

DATED       :  August 24, 1982
TERM        :  approximately 56 years commencing on August 24,
               1982 and terminating 55 years and 90 days after
               the issuance of a final certificate of occupancy
               or the equivalent for the improvements to be
               constructed on the premises by the Lessor

A Short Form Lease is dated August 24, 1982, filed as Land Court
Document No. 1134417.


THE LESSEE'S INTEREST BY MESNE ASSIGNMENTS ASSIGNED

ASSIGNOR    :  JAMES S. ROMIG, as Trustee of the James S. Romig
               Revocable Living Trust dated August 15, 1980

ASSIGNEE    :  POMARE, LTD., a Hawaii corporation

DATED       :  July 11, 2003
FILED       :  Land Court Document No. 3051053

CONSENT     :  Given by HONOLULU LIMITED, a Maryland corporation,
               by instrument dated November 26, 2003, filed as
               Land Court Document No. 3051054, and by 3900
               CORP., a Maryland corporation, by instrument dated
               November 26, 2003, filed as Land Court Document
               No. 3051055.


Said Lease demising the following described premises:

All of those certain parcels of land situate at Kaholaloa, Honolulu,
City and County of Honolulu, State of Hawaii, described as follows:

Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813,  PH: (808) 533-6261

SCHEDULE C CONTINUED


-PARCEL FIRST:-

LOT C, area 1.393 acres, more or less, as shown on Map 1, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1056 of Oahu Railway and Land Company.

Together with right of way over all roads now existing on Lot A-1 as shown on Map 5; Lot(s) A-2-A, A-2-B, A-3-B, A-3-C and A-3-D, as shown on Map 12; Lot 10 as shown on Map 27; Lot F-2 as shown on Map 11; and Lot 6 as shown on Map 26; all being a portion of said application, as reserved in Land Court Document No. 282601.

Being land(s) described in Transfer Certificate of Title No. 145,205 issued to Honolulu Limited, a Hawaii corporation.


-PARCEL SECOND:-

LOTS:  30-B-1, area  2,808 square feet, and
       30-B-2, area 11,474 square feet, more or less, as shown on Map 9, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1758 (amended) of Oahu Railway and Land Company.

Being land(s) described in Transfer Certificate of Title No. 217,231 issued to Honolulu Limited, a Hawaii corporation.


-PARCEL THIRD:-

LOTS:  D-1, area 2,140 square feet, and
       D-2, area 5,140 square feet, more or less, as shown on Map 31, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1056 of Oahu Railway and Land Company;

Being land(s) described in Transfer Certificate of Title No. 270,030 issued to Honolulu Limited, a Hawaii corporation.


**END OF SCHEDULE C**

**Title Guaranty of Hawaii, Inc.**
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

# GENERAL NOTES

1.  There is hereby omitted from any covenants, conditions and reservations contained herein any covenant or restriction based on race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law. Lawful restrictions under state or federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

2.  CERTIFICATE OF MERGER dated January 2, 1998, recorded as Document No. 98-082916 sets forth the following filed with the Department of Commerce and Consumer Affairs, effective on December 31, 1997:

    (A) That HONOLULU LIMITED, a Hawaii corporation, was merged with and into HJW/HONOLULU, INC., a Maryland corporation, and surviving corporation is HJW/HONOLULU, INC.; and

    (B) The name change of HJW/HONOLULU, INC. has changed it's name to HONOLULU LIMITED, a Maryland corporation.

    (A Land Court Petition may be required because the above is not noted on Transfer Certificate(s) of Title referred to herein)

**Title Guaranty of Hawaii, Inc.**
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

# GUIDELINES FOR THE ISSUANCE OF INSURANCE

A. Taxes shown in Schedule B are as of the date such information is available from the taxing authority. Evidence of payment of all taxes and assessments subsequent to such date must be provided prior to recordation.

B. Evidence of authority regarding the execution of all documents pertaining to the transaction is required prior to recordation. This includes corporate resolutions, copies of partnership agreements, powers of attorney and trust instruments.

C. If an entity (corporation, partnership, limited liability company, etc.) is not registered in Hawaii, evidence of its formation and existence under the laws where such entity is formed must be presented prior to recordation.

D. If the transaction involves a construction loan, the following is required:

   (1) a letter confirming that there is no construction prior to recordation; or

   (2) if there is such construction, appropriate indemnity agreements, financial statements and other relevant information from the owner, developer, general contractor and major sub-contractors must be submitted to the Title Company for approval at least one week prior to the anticipated date of recordation.

   Forms are available upon request from Title Guaranty of Hawaii.

E. Chapter 669, Hawaii Revised Statutes, sets forth acceptable tolerances for discrepancies in structures or improvements relative to private property boundaries for various classes of real property. If your survey map shows a position discrepancy that falls within the tolerances of Chapter 669, call your title officer as affirmative coverage may be available to insured lenders.

F. The right is reserved to make additional exceptions and/or requirements upon examination of all documents submitted in connection with this transaction.

G. If a policy of title insurance is issued, it will exclude from coverage all matters set forth in Schedule B of this report and in the printed Exclusions from Coverage contained in an ALTA policy or in the Hawaii Standard Owner's Policy, as applicable. Different forms may have different exclusions and should be reviewed. Copies of the policy forms are available upon request from Title Guaranty of Hawaii or on our website at www.tghawaii.com.

201431032
© **Title Guaranty of Hawaii, Inc.**
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261
Page 9

DATE PRINTED: 3/26/2015

STATEMENT OF ASSESSED VALUES AND REAL PROPERTY TAXES DUE

TAX MAP KEY

DIVISION ZONE SECTION PLAT PARCEL HPR NO.
(1)      1      5      013   018   0000

CLASS: INDUSTRIAL                    AREA ASSESSED:      60,679 SF

ASSESSED VALUES FOR CURRENT YEAR TAXES:  2014

The records of this division show the assessed values and taxes on
the property designated by Tax Key shown above are as follows:

```
                    BUILDING        $           0
                    EXEMPTION       $           0
                    NET VALUE       $           0
                    LAND            $   4,702,400
                    EXEMPTION       $           0
                    NET VALUE       $   4,702,400
                    TOTAL NET VALUE $   4,702,400
```

Installment  (1 - due 8/20;  2 - due 2/20)      Tax Info As Of -  8/20/2014

| Tax Year | Installment | Tax Amount | Penalty Amount | Interest Amount | Other Amount | Total Amount | |
|---|---|---|---|---|---|---|---|
| 2014 | 2 | 29,154.88 | | | | 29,154.88 | PENDING |
| 2014 | 1 | 29,154.88 | 1,749.30 | 618.08 | | 31,522.26 | DELINQUENT |
| 2013 | 2 | 28,262.70 | 2,826.27 | 2,487.12 | | 33,576.09 | DELINQUENT |
| 2013 | 1 | 28,262.70 | 2,826.27 | 4,352.46 | | 35,441.43 | DELINQUENT |

Total Amount Due:    129,694.66

Penalty and Interest Computed to:  8/20/2014

201431032
**© Title Guaranty of Hawaii, Inc.**
235 QUEEN ST., HONOLULU, HAWAII 96813, PH; (808) 533-6261

DATE PRINTED: 3/26/2015

STATEMENT OF ASSESSED VALUES AND REAL PROPERTY TAXES DUE

TAX MAP KEY

DIVISION ZONE SECTION PLAT PARCEL HPR NO.
(1)        1      5      013   003    0000

CLASS: INDUSTRIAL                    AREA ASSESSED:        4,948 SF

ASSESSED VALUES FOR CURRENT YEAR TAXES: 2014

The records of this division show the assessed values and taxes on
the property designated by Tax Key shown above are as follows:

```
BUILDING          $  8,391,200
EXEMPTION         $          0
NET VALUE         $  8,391,200
LAND              $    339,400
EXEMPTION         $          0
NET VALUE         $    339,400
TOTAL NET VALUE   $  8,730,600
```

Installment (1 - due 8/20; 2 - due 2/20)     Tax Info As Of -    8/20/2014

| Tax Year | Installment | Tax Amount | Penalty Amount | Interest Amount | Other Amount | Total Amount | |
|---|---|---|---|---|---|---|---|
| 2014 | 2 | 54,129.72 | | | | 54,129.72 | PENDING |
| 2014 | 1 | 54,129.72 | 3,247.78 | 1,147.55 | | 58,525.05 | DELINQUENT |
| 2013 | 2 | 53,962.94 | 5,396.30 | 4,748.74 | | 64,107.98 | DELINQUENT |
| 2013 | 1 | 53,962.94 | 5,396.30 | 8,310.29 | | 67,669.53 | DELINQUENT |

Total Amount Due:    244,432.28

Penalty and Interest Computed to:  8/20/2014

© Title Guaranty of Hawaii, Inc.
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261

DATE PRINTED:  3/26/2015

STATEMENT OF ASSESSED VALUES AND REAL PROPERTY TAXES DUE

TAX MAP KEY

DIVISION ZONE SECTION PLAT PARCEL HPR NO.
   (1)     1     5     013   004   0000

CLASS: INDUSTRIAL                AREA ASSESSED:        16,614 SF

ASSESSED VALUES FOR CURRENT YEAR TAXES:  2014

The records of this division show the assessed values and taxes on
the property designated by Tax Key shown above are as follows:

```
            BUILDING       $           0
            EXEMPTION      $           0
            NET VALUE      $           0
            LAND           $   1,139,700
            EXEMPTION      $           0
            NET VALUE      $   1,139,700
            TOTAL NET VALUE $  1,139,700
```

Installment (1 - due 8/20;  2 - due 2/20)     Tax Info As Of -   8/20/2014

| Tax Year | Installment | Tax Amount | Penalty Amount | Interest Amount | Other Amount | Total Amount | |
|---|---|---|---|---|---|---|---|
| 2014 | 2 | 7,066.14 | | | | 7,066.14 | PENDING |
| 2014 | 1 | 7,066.14 | 423.97 | 149.80 | | 7,639.91 | DELINQUENT |
| 2013 | 2 | 6,849.76 | 684.98 | 602.78 | | 8,137.52 | DELINQUENT |
| 2013 | 1 | 6,849.76 | 684.98 | 1,054.86 | | 8,589.60 | DELINQUENT |

Total Amount Due:     31,433.17

Penalty and Interest Computed to:  8/20/2014

© **Title Guaranty of Hawaii, Inc.**
235 QUEEN ST., HONOLULU, HAWAII 96813, PH: (808) 533-6261